UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| MICHAEL S. MURPHY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:14-cv-00400-JAW |
| | ) | |
| JAMES N. MATTIS, | ) | |
| | ) | |
| Defendant. | ) | |

## SUMMARY JUDGMENT ORDER

An employee of the Defense Logistics Agency at the Portsmouth Naval Shipyard brings suit against the Secretary of Defense, alleging that the Secretary discriminated against him on the basis of his age in violation of the Age Discrimination in Employment Act (ADEA) and his deafness in violation of the Rehabilitation Act. The employee asserts that the Secretary denied him promotions on account of his age and deafness and continuously denied his reasonable accommodation requests.

Before the Court is the Secretary's motion for partial summary judgment. The Secretary seeks judgment as a matter of law on whether the scope of the employee's discrimination claims is limited to a forty-five day period prior to his initial contact with an EEO counselor. Further, the Secretary moves for summary judgment on the employee's failure to promote claims.

The Court concludes that the limitations periods contained in the Rehabilitation Act and the ADEA limit the employee's claims to events that occurred

within the forty-five day period prior to his contact with the EEO counselor and that neither equitable exceptions nor federal regulations expand the scope of the employee's claims.   Further, the Court concludes that the Secretary is entitled to summary judgment on the employee's failure to promote claims because the human resources representative who rejected the employee's promotion application was unaware of the employee's age or disability.   The employee's failure to accommodate claim remains for trial.

## I.   PROCEDURAL POSTURE

### A.   Pleadings

On October 10, 2014, Michael Murphy brought suit against the Secretary of the Navy, Ray Mabus. *Compl. and Demand for Trial by Jury* (ECF No. 1).   On January 20, 2015, Secretary Mabus filed a motion to dismiss.[1] *Def.'s Mot. to Dismiss the Compl.* (ECF No. 11).   Although the pleadings have been amended several times, for purposes of this motion, the operative pleading is Mr. Murphy's Second Amended Complaint against Secretary of Defense James Mattis, filed on May 25, 2016.   *Second*

---

[1]      The Plaintiff initially brought suit against Ray Mabus, the Secretary of the Navy; however, the Plaintiff learned that he was actually employed by the Department of Defense, and on February 10, 2015, he moved to amend his Complaint to substitute then Secretary of Defense Chuck Hagel for Secretary Mabus.  *Pl.'s Consented to Resp. to Mot. to Dismiss and Pl.'s Consented to Mot. to Amend Compl.*  (ECF No. 12); *Order Granting Mot. to Amend* (ECF No. 14).  At the Local Rule 56(h) conference, Mr. Murphy moved to amend his Complaint again, and the Court granted the motion.  *Oral Mot. to Amend Compl.* (ECF No. 54); *Oral Order Granting Oral Mot. to Amend* (ECF No. 55).

In addition, as the Secretaries of Defense changed, so did the Complaint. By the time the motion to amend was granted, Ashton Carter had replaced Mr. Hagel, so Mr. Carter became the named Defendant.  *See* 161 Cong. Rec. S1012 (daily ed. February 12, 2015); *Order Granting Mot. to Amend* (ECF No. 14); *First Am. Compl. and Demand for Trial by Jury* (ECF No. 15).  With James Mattis' confirmation and appointment as Secretary of Defense, Mr. Murphy moved to substitute Mr. Mattis as the named Defendant.  *Mot. to Substitute* (ECF No. 99).  On February 1, 2017, the Court granted his motion.  *Order* (ECF No. 100).

*Am. Compl.* (ECF No. 56).  The Secretary answered the Second Amended Complaint the same day it was filed.  *Def.'s Answer to Second Am. Compl.* (ECF No. 57).

On May 6, 2016, the Secretary filed a notice of intent to move for partial summary judgment.  *Notice of Intent to Move for Summ. J.* (ECF No. 46).  On May 24, 2016, the Court held a Local Rule 56 pre-filing conference.  *Min. Entry* (ECF No. 53).

### B.    The Secretary's Motion for Partial Summary Judgment

The parties subsequently agreed to eight stipulated facts.  *Redacted Documents*, Attach. 2, *Stipulation and J.R. Solely for Purposes of Summ. J.* (ECF No. 102) (*Stip.*).  On August 10, 2016, the Secretary filed a motion for partial summary judgment and a statement of undisputed material facts.  *Redacted Documents*, Attach. 3, *Def.'s Mot. for Partial Summ. J.* (ECF No. 102) (*Def.'s Mot.*); *Redacted Documents*, Attach. 4, *Statement of Undisputed Material Facts in Supp. of Def.'s Mot. for Partial Summ. J.* (ECF No. 102) (DSMF).  On October 5, 2016, Mr. Murphy filed a memorandum of law in opposition to Mr. Murphy's motion, a responsive statement of material facts, and an additional set of material facts.  *Pl.'s Opp'n to Def.'s Mot. for Partial Summ. J.* (ECF No. 73) (*Pl.'s Opp'n*); *Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts and Pl.'s Statement of Additional Material Facts* at 1–12 (ECF No. 74) (PRDSMF); *Id.* at 12–42 (PSAMF).  On October 26, 2016, the Secretary filed a reply memorandum and a reply statement of facts.  *Def.'s Reply in Further Supp. of Mot. for Partial Summ. J.* (ECF No. 96) (*Def.'s Reply*); *Reply Statement of*

*Material Facts Pursuant to Local Rule 56(D) and 56(E) Responses* (ECF No. 97) (DRPSAMF).[2]

## II.   SUMMARY JUDGMENT FACTS

The Court recounts the facts in the light most favorable to Mr. Murphy consistent with record support. *Alfano v. Lynch*, 847 F.3d 71, 74 (1st Cir. 2017). Although the Court must draw all reasonable inferences in Mr. Murphy's favor, the Court affords no evidentiary weight to "conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)).

### A.   Mr. Murphy's Disability

Michael S. Murphy was born in 1943. *Stip.* ¶ 1. He became profoundly deaf at seven months old as a result of illness. *Stip.* ¶ 2; PSAMF ¶ 7; DRPSAMF ¶ 7. His deafness is a physical impairment that substantially limits one or more of his major life activities such that he is an individual with a disability. *Stip.* ¶ 3; PSAMF ¶¶ 6, 125; DRPSAMF ¶¶ 6, 125.

Mr. Murphy communicates in American Sign Language (ASL) as his first language. *Stip.* ¶ 2. He had late access to language and only began formal language learning in ASL at age eight, which is well after the window for which easy

---

[2]      A word on pagination. For some filings, such as the Secretary's motion for partial summary judgment and reply, the pagination of the ECF filing system differs from the pagination of the document itself. The Court's citations are to the ECF pagination.

acquisition of language can occur.  PSAMF ¶ 8; DRPSAMF ¶ 8.  Not every deaf person

who communicates with ASL is able to read English text; rather, some deaf

individuals only see characters because their language is signing.  PSAMF ¶ 13;

DRPSAMF ¶ 13.  Mr. Murphy's own reading, writing, and vocabulary skills in

English are quite limited.[3]  DSMF ¶ 3; PRDSMF ¶ 3.  His reading level does not

---

[3]      Mr. Murphy interposes a qualification: "Mr. Murphy cannot read English."  PRDSMF ¶ 3.  He also proposes two related statements of fact: "Mr. Murphy cannot effectively read English," PSAMF ¶ 9, and "Mr. Murphy cannot access written communication in English."  PSAMF ¶ 11.  As a preliminary matter, it bears noting that the Secretary's proposed statement of fact is taken directly from a declaration that Mr. Murphy submitted under penalty of perjury on May 1, 2014, as part of his EEO discrimination complaint.  *See Redacted Documents*, Attach. 1, *Decl. Under Penalty of Perjury* at 3 (ECF No. 104) (*Murphy EEO Decl.*) ("[M]y reading, writing and vocabulary in English are quite limited").

Additionally, many of Mr. Murphy's record citations do not support his qualification.  Some of the cited materials relate to English proficiency among the deaf population generally and not to Mr. Murphy in particular.  *See, e.g., Tr. of Dep. of Donna B. Shepheard* at 130:23–131:7 (ECF No. 87) (*Shepheard Dep.*); *Id.*, Attach. 13, *June 26, 2012 Deaf Employee Group Meeting Minutes* at 5 (ECF No. 87) (*June 26, 2012 Email*); *Dep. of Terry Morrell* at 18:13–15; 65:8–12; 66:3–5 (ECF No. 75) (*Morrell Dep.*); *Dep. of Sheri Kelley* at 46:22–24 (ECF No. 76) (*Kelley Dep.*).  Other cited materials actually support the Secretary's proposed statement.  *See, e.g., Shepheard Dep.* at 116:9–11 ("I believe he's very limited in English"); *Dep. of Paul Gambrell*, Attach. 4, *December 9, 2013 Email Re: Mike Murphy* at 2 (ECF No. 78) (same); *Kelley Dep.* 38:22–39:3 (same).  Still other cited materials have nothing to do with English proficiency whatsoever.  *See, e.g., Shepheard Dep.* at 129.

Mr. Murphy's qualification and proposed statements of fact suggest that he is seeking to distinguish the ability to read from the ability to recognize basic words in English.  *See also Decl. of Michael S. Murphy* ¶ 3 (ECF No. 82) (*Murphy Decl.*) ("Although I engage in word recognition of a limited number of individual words in written English, I cannot read English").  In her deposition, Dr. Romy Spitz discussed this distinction:

| Q: | [C]an Mr. Murphy access written communications in English? |
|---|---|
| A: | In my opinion, no. |
| Q: | He cannot access written communications in English at all? |
| A: | He may be able to read some words . . . He may be able to read a few sentences that are very simple English.  But it is my opinion that he cannot access written communication at the level of, for example, a fifth grader. |
| Q: | Okay.  What would you place his reading comprehension in written English at; what level? |
| A: | I did not formally test him, but from his interactions with me and his struggles with other forms of English presentation, my best guess for him would be at around third grade level. |

. . .

| A: | I believe he can read third grade level words.  For me that's not a reading process.  That's a word recognition process.  And then he's applying his cognition to figure out what the meaning is. |

constitute the true reading process; instead, he functions with a word recognition

process.[4]  PSAMF ¶ 10; DRPSAMF ¶ 10.

Mr. Murphy struggles with closed captioning and texting in English.[5]  PSAMF

¶ 14; DRPSAMF ¶ 14.  Mr. Murphy can compose and read very basic text messages

---

*Dep. of Romy V. Spitz, Ph.D.* at 57:10–58:4; 59:18 (ECF No. 79) (*Spitz Dep.*).

The Court understands that there is a distinction between recognizing words and "accessing" written communication or engaging in a "reading process."  Even so, the statement "Mr. Murphy cannot read English" is potentially misleading because, as Dr. Spitz and Mr. Murphy acknowledge, Mr. Murphy can understand some written words. In the Court's view, the Secretary's proposed statement avoids this problem while simultaneously making clear that Mr. Murphy's reading ability is quite limited.  Finally, the Secretary's proposed statement seems more accurate than Mr. Murphy's statement that he "cannot effectively read English" because the Secretary's statement hues closer to the record evidence.

[4]      In support of this statement, Mr. Murphy cites the deposition of Dr. Spitz.  PSAMF ¶ 10 (citing *Spitz Dep.* at 59:18–21).  The Secretary seeks to qualify the statement, arguing that Dr. Spitz fails to satisfy the requirements of Federal Rule of Evidence 702 and the standards for the admissibility of expert testimony set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).  DRPSAMF ¶¶ 9–10.  In particular, the Secretary argues that Dr. Spitz did not formally test Mr. Murphy's reading ability, was not retained to give a reliable idea about his ability to read English, and simply asked Mr. Murphy over a matter of minutes whether he could read information provided to him.  DRPSAMF ¶ 9.

A district court may exclude expert testimony when ruling on a motion for summary judgment if the testimony fails to cross the *Daubert* threshold.  *See Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997).  However, the First Circuit has cautioned that "the *Daubert* regime should be employed only with great care and circumspection at the summary judgment stage."  *Id.*  This is because *Daubert*—as well as *Kumho*—requires a complex factual inquiry that is best suited to the trial setting.  *Id.*  District courts "will be hard-pressed in all but the most clearcut cases to gauge the reliability of expert proof on a truncated record."  *Id.*

More typically, if a party wishes to raise a *Daubert/Kumho* issue that may affect summary judgment, the party will file a *Daubert/Kumho* motion before filing a motion for summary judgment to obtain a definitive, separate ruling as to the extent to which, if at all, the proposed expert testimony is admissible.  This type of issue is usually raised at the Local Rule 56(h) conference.  It is difficult to address a *Daubert/Kumho* motion cloaked as a motion for summary judgment and to do justice to expert qualifications and fit in the context of an objection to a statement of material fact.

In this case, the Court prefers to defer a decision on the admissibility of Dr. Spitz's testimony and to assume that the doctor's testimony is admissible for purposes of the motion for summary judgment.  First, this is not a "clearcut" case where "defects are obvious on the face of [the] proffer[.]"  *Id.* (alterations added).  Without a more developed record, the Court is unwilling to say that Dr. Spitz was not qualified to assess Mr. Murphy's reading process.

Moreover, admitting Dr. Spitz's testimony for summary judgment does not compromise the Secretary's summary judgment position.  The record reflects—and the Secretary agrees—that Mr. Murphy had a limited ability to read words in English.  *See* DSMF ¶ 3.  The precise process Mr. Murphy has used to comprehend these basic words is not determinative.

[5]      Mr. Murphy proposes: "Mr. Murphy is unable to associate written words with language because he is deaf; therefore, Mr. Murphy struggles with closed caption or texting in the English language."  PSAMF ¶ 14 (citing *Shepheard Dep.* at 131:3–7; *Id.* Attach. 13, *July 17, 2012 Email Re: Deaf Employees Group Meeting* at 1 (ECF No. 87) (*July 17, 2012 Email*); *July 26, 2012 Email* at 1).

on his cellphone, compose and read very basic email messages, and compose and read very basic hand-written or typed correspondence without the aid of a friend, co-worker, or an interpreter; in this context, "very basic" means extremely simplistic, consisting of one or two words.  DSMF ¶ 4, PRDSMF ¶ 4.[6,7]   However, when Mr.

---

The Secretary qualifies the statement, arguing that Mr. Murphy's assertion that he "is unable to associate written words with language because he is deaf" is unsupported by the record citations. DRPSAMF ¶ 14.  Upon review of the record, the Court agrees with the Secretary.  Under Local Rule 56(f), the Court "may disregard any statement of fact not supported by a specific citation[.]"  *See also Alfano v. Lynch*, 847 F.3d 71, 74 (1st Cir. 2017) ("[A]t the summary judgment stage, we rehearse the facts in the light most favorable to the nonmovant . . . *consistent with record support*") (emphasis added).  Accordingly, the Court excises the portion of Mr. Murphy's statement that reads "Mr. Murphy is unable to associate written words with language because he is deaf."

[6]     Mr. Murphy interposes a qualification: "Mr. Murphy is not able to create and send emails in written English by himself; instead he relies on a friend at work to help him type and edit emails." PRDSMF ¶ 4.

The Secretary's proposed paragraph is a verbatim reiteration of Mr. Murphy's own answers to requests for admission.  *Compare* DSMF ¶ 4 ("Plaintiff can compose very basic text messages on his cellular telephone, read very basic text messages on his cellular telephone, compose very basic email messages, read very basic email messages, compose very basic hand-written and/or typed correspondence, and read very basic hand-written and/or typed correspondence in written English without the aid of an [ASL] interpreter); *with Decl. of A.U.S.A. Andrew K. Lizotte*, Attach. 4, *Pl.'s Answers to Def.'s Req. for Admis.* ¶¶ 8–13 (ECF No. 63) (*Req. for Admis.*).  In other words, Mr. Murphy's contention that he "is not able to create and send emails in written English by himself" appears to contradict his own answers to the requests for admission.

At the same time, Mr. Murphy did testify that when composing and reading email generally, he gets help from a co-worker who corrects his English or explains words beyond his comprehension. *See Redacted Documents*, Attach. 5, *Dep. of Michael S. Murphy* at 11:12–20 (ECF No. 102) (*Murphy Dep. June 2015*).  Furthermore, others confirmed that when they received written notes or emails from Mr. Murphy, the written correspondence was very limited, consisting of one or two words, often with clear grammatical errors.  *Redacted Document*, Attach. 1, *Tr. of Dep. of William W. Fales, Jr.* at 139:9–13 (ECF No. 91-1) (*Fales Dep.*); *Shepheard Dep.* at 22:16–18; 117:11–13; 131:18–20 (ECF No. 87).

Here, the parties quibble over nuanced degrees of Mr. Murphy's incomprehension, and the Court concludes that resolving the disagreement is not essential to fairly resolving the merits of the motion.  What is undisputed from the record is that Mr. Murphy is deaf and has an extremely limited ability to use of English without assistance.  Accordingly, the Court qualifies the Secretary's statement to reflect that when Mr. Murphy uses email, he generally receives help, and to note that when he communicates in writing the notes are very simplistic, consisting of one or two words.

[7]     Mr. Murphy proposes: "Mr. Murphy cannot read the emails that are sent to him or the notes that are written to him."  PSAMF ¶ 12.  The Secretary interposes a qualification, arguing that the statement conflicts with Mr. Murphy's own testimony.  DRPSAMF ¶¶ 9, 12.  In particular, Mr. Murphy testified, "When I found out I wasn't promoted, I read it on the computer."  *Decl. of A.U.S.A. Andrew K. Lizotte*, Attach. 5, *Cont. Dep. of Michael S. Murphy* at 23:23–24 (ECF No. 63) (*Murphy Dep. Mar. 2016*).  Moreover, the Court notes that in his answers to the Secretary's requests for admissions, Mr. Murphy stated that "he reads very basic email messages without the aid of a friend, co-worker or an interpreter[.]"  *Req. for Admis.* ¶ 11.  Accordingly, Mr. Murphy's statement that he "cannot read the emails that are sent to him" is unsupported by the record, and the Court excludes the statement in

7

Murphy wants to send or read an email, he generally gets help from a co-worker to correct his English or explain words he does not understand.  DSMF ¶ 4; PRDSMF ¶ 4.  Mr. Murphy prefers that all communications with him be in ASL, because "if it's not in ASL, it's not completely coming to me."  PSAMF ¶ 15; DRPSAMF ¶ 15 (quoting *Redacted Documents*, Attach. 5, *Dep. of Michael S. Murphy* at 64:13–14 (ECF No. 102) (*Murphy Dep. June 2015*)).

### B.    Mr. Murphy's Employment at the Portsmouth Naval Shipyard

#### 1.    Transfer from the Navy to the DLA

From approximately 1979 until June 5, 2010, Mr. Murphy was employed by the Department of the Navy (Navy) as a civilian Materials Handler, WG-06, Step 5, at the Portsmouth Naval Shipyard in Kittery, Maine.  *Stip.* ¶ 4.  On June 6, 2010, Mr. Murphy's employment was transferred to the Defense Logistics Agency (DLA) pursuant to the Department of Defense's base realignment and closure program. *Stip.* ¶ 5.  Since June 6, 2010, Mr. Murphy has been employed by the DLA as a Materials Handler, WG-06, Step 5, at the Portsmouth Naval Shipyard.[8]  DSMF ¶ 12; PRDSMF ¶ 12.  Mr. Murphy is unsure of when his position transferred from the Navy to the DLA.  DSMF ¶ 12; PRDSMF ¶ 12.  With respect to Mr. Murphy's employment

---

favor of the Secretary's statement that Mr. Murphy can "compose and read *very basic* email messages[.]"  DSMF ¶ 4 (emphasis added).

[8]    Mr. Murphy interposes a qualification: "Mr. Murphy did not understand or have knowledge that a transition occurred when his position shifted from the Navy to the [DLA.]"  PRDSMF ¶ 10 (citing *Murphy EEO Decl.* ¶¶ 1–2; *Murphy Dep. June 2015* at 18:9–12).  The Court qualifies the Secretary's statement to reflect that Mr. Murphy does not recall when the transition to the DLA occurred.  *See Murphy Dep. June 2015*, at 18:9–12 ("My memory is weak because of when they set up DLA, you know, when that was actually set up.  How many years exactly, I don't know.  What year they set up DLA, I don't know").

with the Navy from 1979–2010, many of the individuals in Mr. Murphy's prior chain of command have retired or are now deceased.[9]  DSMF ¶¶ 8–9; PRDSMF ¶¶ 8–9.

The DLA is a combat support agency of the Department of Defense.  DSMF ¶ 13; PRDSMF ¶ 13.  It is distinct from the Navy, which is a separate agency component of the Department of Defense headed by the Secretary of the Navy.[10]  DSMF ¶ 13; PRDSMF ¶ 13.  The Defendant, James Mattis, is the Secretary of Defense and is ultimately responsible for the oversight of the DLA.  DSMF ¶ 14; PRDSMF ¶ 14.

The Equal Employment Opportunity (EEO) office that services Navy employees at the Portsmouth Naval Shipyard is located on-site at the Shipyard.  DSMF ¶ 15; PRDSMF ¶ 15.  DLA employees who work at the Portsmouth Naval Shipyard, such as Mr. Murphy, are serviced by a separate DLA EEO office located in Columbus, Ohio.[11]  DSMF ¶ 16; PRDSMF ¶ 16.  There was some confusion among DLA employees and management about which EEO office serviced DLA employees.

---

[9]   Mr. Murphy objects, arguing that the Secretary's assertion is too vague.  PRDSMF ¶¶ 8–9. Although the Secretary's statement does not mention specific dead or retired individuals, the statement does refer to a specific subset of employees within the Shipyard—i.e., Mr. Murphy's former supervisors during his time as a Navy employee.  Moreover, the statement finds support in Mr. Murphy's own testimony.  *See Decl. of A.U.S.A. Andrew K. Lizotte*, Attach. 2, *Continuation of Dep. of Michael S. Murphy* at 67:1–4 (ECF No. 63) (*Murphy Dep. Aug. 2015*) ("Q: Many of those individuals are retired from the Navy now, aren't they?  A: Yes.  They either retired, or they since passed away or old age, you know").  The statement is not prohibitively vague.

[10]  Mr. Murphy interposes a qualification: "The DLA and the Navy are not distinct from one another as they both fall under the umbrella of the Department of Defense."  PRDSMF ¶ 13.  The fact that both agencies fall under the same department does not mean they are not distinct for purposes of the present lawsuit.  Further, Mr. Murphy's record citations do not support his assertion that the "DLA and the Navy are not distinct"; in fact, the cited materials say just the opposite.  *See Dep. of Paul Gambrell* at 73:20–74:3 (ECF No. 78) (*Gambrell Dep.*) ("[T]he DLA and Navy are separate DOD agencies and are therefore serviced by different HRO and EEO offices").  The Court rejects the qualification.

[11]  Mr. Murphy interposes a qualification: "There was confusion with both DLA employees and DLA management about which EEO serviced DLA employees, because there was an EEO stationed at the Shipyard."  PRDSMF ¶ 16.  The record supports the qualification.  *See Kelley Dep.* at 86:21–87:10. The Court qualifies the Secretary's statement accordingly.

DSMF ¶ 16; PRDSMF ¶ 16; PSAMF ¶ 154; DRPSAMF ¶ 154.  The DLA EEO expects that the Navy EEO would apprise them of any DLA complaints that were brought to the Navy's office accidently.  PSAMF ¶ 155; DRPSAMF ¶ 155.

In 2010, following his transfer to the DLA, Mr. Murphy participated in a video conference with Paul Gambrell, a DLA EEO Disability Program Manager.  *Decl. of Paul Allen Gambrell* ¶¶ 5–7 (ECF No. 68).  An ASL interpreter translated the video conference.  *Id.*; DSMF ¶ 17; PRDSMF ¶ 17.  During the video conference, Mr. Gambrell told Mr. Murphy that the DLA EEO office located in Columbus, Ohio, would provide EEO services to him as a DLA employee, and that if he had any concerns or issues with the DLA, EEO contacts in the Ohio office would provide him with assistance.[12]  DSMF ¶ 18; PRDSMF ¶ 18.  However, following the video conference, Mr. Murphy did not fully understand that the DLA EEO office in Ohio was his designated EEO office.  *See Dep. of Sheri Kelley* at 93:23–10 (ECF No. 76) (*Kelley Dep.*).

---

[12]     Mr. Murphy interposes a qualification, arguing that "Plaintiff was not effectively informed because, despite participating in this conference, the information was not successfully communicated and Mr. Murphy did not understand the topics discussed."  PRDSMF ¶ 18.  For support, Mr. Murphy cites his own deposition, in which he states that he does not recall when the transfer to the DLA occurred, *see Murphy Dep. June 2015* at 18:9–13, and the deposition of Sheri Kelley, in which she states that Mr. Murphy conveyed to her that he visited the EEO office at the Portsmouth Naval Shipyard instead of contacting the proper DLA EEO office in Columbus, Ohio.  *See Kelley Dep.* at 93:24–95:6.

Mr. Murphy's assertion that he "was not effectively informed" calls for a legal conclusion with respect to Mr. Murphy's equitable tolling argument.  The Court affords "no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'"  *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)).  However, the record indicates that after Mr. Murphy learned that he was not selected for the General Supply Specialist positions, he approached the Navy EEO office on the Shipyard instead of the DLA EEO office in Columbus, Ohio.  *See Kelley Dep.* at 94:23–95:10.  From this, it is reasonable to infer, for purposes of summary judgment, that Mr. Murphy did not fully understand that the DLA EEO office in Ohio was his primary contact for EEO complaints following his transfer to the DLA.  The Court qualifies the statement accordingly.

### 2.    Mr. Murphy's Wage History with the DLA

From the date of his transfer to the DLA until 2013, Mr. Murphy earned an hourly salary of $21.25.  DSMF ¶¶ 19–22; PRDSMF ¶¶ 19–22.  Mr. Murphy received a raise in 2013 and again in 2014, increasing his hourly salary to $21.47 and $21.69, respectively.  DSMF ¶¶ 23–24; PRDSMF ¶¶ 23–24.  From the date of his transfer to the DLA through 2015, Mr. Murphy's hourly wage was equal to or greater than that paid to his fellow Materials Handler colleagues.  DSMF ¶¶ 19–25; PRDSMF ¶¶ 19–25.  Mr. Murphy testified that his younger Materials Handler co-workers are paid less than he is.[13]  DSMF ¶ 26; PRDSMF ¶ 26.  However, Mr. Murphy has observed his supervisors encourage his younger and non-disabled co-workers to apply for and obtain promotions, whereas Mr. Murphy has never received a promotion over the course of his employment.[14]  DSMF ¶ 26; PRDSMF ¶ 26; PSAMF ¶ 106; DRPSAMF ¶ 106.

### C.    Mr. Murphy's Experience as a Deaf Individual Throughout His Employment at the Shipyard

---

[13]    Mr. Murphy interposes a qualification: "Mr. Murphy's younger, non-disabled Material Handler co-workers are encouraged and selected for promotion and then awarded higher salaries.  Mr. Murphy has worked as a Material Handler for 35 years without such movement and accompanying salary increase."  PRDSMF ¶ 26 (citations omitted).  The record supports the qualification, and the Court inserts qualifying language that more closely tracks the record citations.  *See Pl.'s Answers to Def.'s First Set of Interrogs.* at 3, 6 (ECF No. 83) (*Murphy Interrogs. I*).

[14]    Mr. Murphy also proposes: "Mr. Murphy's younger and non-disabled co-workers are frequently encouraged to apply for promotions and open positions at the Shipyard, but Mr. Murphy has never been encouraged to apply for any promotions or openings."  PSAMF ¶ 106.  The Secretary qualifies the statement, arguing that the record shows that Anthony Dalfonso, Mr. Murphy's first-line supervisor, and Donna Shepheard, his third-line supervisor, have encouraged him to apply for promotions or openings.  DRPSAMF ¶ 106.  In particular, the Secretary points out that Mr. Murphy testified that Mr. Dalfonso "gave me a tip that it was time to apply" to some job openings and that Mr. Dalfonso helped him seek promotions.  *Id.* (citing *Murphy Dep. June 2015* at 68:10–70:14).  Additionally, the Secretary notes that in a 2011 email regarding an application for a WG-08 tool attendee position, Mr. Murphy specifically stated that Ms. Shepheard "recommends me to apply [for] this position."  *Id.* (citing *Redacted Document*, Attach. 3, *Email Communication* at 5 (ECF No. 91-3)).  The Court concludes that the record does not support Mr. Murphy's statement that he "has never been encouraged to apply for any promotions or openings."  The Court omits that portion of the statement.

11

1.   **Difficulties   Communicating   with   Co-Workers,
Supervisors, and EEO Contacts**

a.   **Need for Interpretation**

Mr. Murphy's supervisors and DLA EEO contacts are aware that Mr. Murphy's primary language and means of communication is ASL.[15]   PSAMF ¶¶ 24–25; DRPSAMF ¶¶ 24–25.   The DLA is aware that Mr. Murphy's language level, even in ASL, is minimal, and that qualified ASL interpreters with certain skill levels are necessary for Mr. Murphy to communicate successfully with the hearing world. PSAMF ¶ 27; DRPSAMF ¶ 27.   An ASL interpreter is supposed to be available for Mr. Murphy on Thursdays from 7:45 A.M. to 8:45 A.M. during the weekly department meetings.[16]   PSAMF ¶ 58; DRPSAMF ¶ 58.   However, there is not always an interpreter present at the weekly department meetings; for example, from mid-2012 through mid-2013, an interpreter was absent from approximately six weekly

---

[15]   Mr. Murphy proposes: "Mr. Murphy's supervisors and DLA EEO contacts are aware that Mr. Murphy's language and means of communication is ASL, not English."   PSAMF ¶ 24.   The Secretary qualifies the statements for the reasons set forth in footnote three.   For the reasons described in that footnote, the Court adjusts the statement to reflect that Mr. Murphy's supervisors knew that his primary means of communication was ASL.

[16]   In addition to PSAMF ¶ 58, Mr. Murphy proposes the following statement: "This is the only time that an ASL interpreter is available to Mr. Murphy."   PSAMF ¶ 59 (citing *Sealed Additional Attachs.*, Attach. 7, *Tr. of Dep. of Anthony R. Dalfonso*, at 73:3–8 (ECF No. 86) (*Dalfonso Dep.*)).   The Secretary denies the statement, arguing that Mr. Dalfonso also testified in his deposition that interpreters are always present at unscheduled meetings.   DRPSAMF ¶ 59 (citing *Dalfonso Dep.* at 40:25–41:9).   Furthermore, the Secretary points out that Mr. Murphy has not disputed that he can separately request an ASL interpreter from his supervisor.   *Id.* (citing PRDSMF ¶ 5).   The Secretary also highlights that Mr. Murphy testified that Mr. Dalfonso obtains an interpreter when Mr. Murphy requests one.   *Id.* (citing PRDSMF ¶ 5; *Murphy Dep. June 2015* at 63:3–6).   Upon review of the parties' record citations, the Court concludes that the record evidence does not support Mr. Murphy's categorical statement that ASL interpreters are only available to him during the weekly meetings. The Court excludes the statement.

meetings.[17]   PSAMF ¶ 60; DRPSAMF ¶ 60.   Moreover, the ASL interpreter is sometimes late to the meetings.  PSAMF ¶ 61; DRPSAMF ¶ 61.

When an interpreter is not present, Mr. Murphy cannot participate in the discussion with his co-workers.  PSAMF ¶ 60; DRPSAMF ¶ 60.  The expectation is that the Supply Department will not hold the meeting unless there is an interpreter present for Mr. Murphy.  PSAMF ¶ 62; DRPSAMF ¶ 62.  When there are last minute meetings in the Supply Department and there is no interpreter present for Mr. Murphy to participate, William Fales—Mr. Murphy's second-line supervisor— has told Mr. Murphy to "just wait until Thursday, we will fill you in then."  PSAMF ¶ 63; DRPSAMF ¶ 63.

Mr. Fales would often ask Mr. Murphy's co-worker and friend Tanya Knowles to interpret personal conversations between him and Mr. Murphy instead of hiring a certified ASL interpreter.  PSAMF ¶¶ 21–22; DRPSAMF ¶¶ 21–22.  Ms. Knowles is not an ASL interpreter and only "knows" ASL through interactions with Mr. Murphy at work.  PSAMF ¶ 21; DRPSAMF ¶ 21.  However, when Ms. Knowles tried to interpret the mandatory weekly meetings for Mr. Murphy when an ASL interpreter was absent, Mr. Fales would not let her; rather, Mr. Fales told Mr. Murphy that he would have to wait until next week's meeting when a certified ASL interpreter was

---

[17]     Mr. Murphy proposes the following statement in relevant part: "At the weekly department meetings, there is not always an interpreter available to translate for Mr. Murphy[.]"  PSAMF ¶ 60. The Secretary seeks to qualify the statement to clarify how many times an interpreter was not present at the weekly meetings.  DRPSAMF ¶ 60.  Of the record citations that Mr. Murphy provides, only the declaration of Mr. Murphy's co-worker, Tanya Knowles, indicates how often interpreters were absent. She states, "the first year I worked with Mr. Murphy [i.e., from mid-2012 to mid-2013], an ASL interpreter failed to be present at approximately six of these Weekly Meetings."  *Decl. of Tanya Knowles* ¶¶ 5, 16 (ECF No. 81) (*Knowles Decl.*).  The Court qualifies the statement to reflect Ms. Knowles' testimony.

present.  PSAMF ¶ 23; DRPSAMF ¶ 23.  Ms. Knowles also helped Mr. Murphy draft

emails to his supervisors and the DLA EEO.[18]  PSAMF ¶ 20; DRPSAMF ¶ 20.

>             **b.    Mr. Murphy's Communications with His Supervisors**

Mr. Fales noted in his September 9, 2010 "Memo to File" that "the

communication gap [with Mr. Murphy] is hard for all concerned."  PSAMF ¶ 16;

DRPSAMF ¶ 16.  Mr. Dalfonso, Mr. Murphy's first-line supervisor, testified that Mr.

Murphy often approaches Mr. Fales with complaints but that "no one can really

understand [what] he's complaining about."  *Sealed Additional Attachs.*, Attach. 7,

*Tr. of Dep. of Anthony R. Dalfonso*, at 42:18–43:23 (ECF No. 86) (*Dalfonso Dep.*).

When Mr. Murphy goes to Mr. Fales' office and attempts to communicate with him

using hand gestures, Mr. Fales does not request the assistance of an interpreter or

locate some other communication device.[19]  PSAMF ¶ 18; DRPSAMF ¶ 18.  Mr.

---

[18]    Mr. Murphy proposes in relevant part: "Tanya Knowles . . . typed emails from Mr. Murphy to Paul Gambrell, William Fales, and other DLA management and EEO contacts."  PSAMF ¶ 20 (citing *Murphy Dep. June 2015* at 11:1–22, 13:1–16, 30:18–25, 31:1–13).  The Secretary seeks to qualify the statement to clarify that Ms. Knowles "helped [Mr. Murphy] correct and finish emails he drafted in English to his supervisors and the DLA EEO."  DRPSAMF ¶ 20.  The record supports the Secretary's qualification. *See Murphy Dep. June 2015* 31:7–10 ("I typed [the email] and then I showed it to Tanya, and she thought it needed some correcting.  And she tried to explain it to me, but eventually she took the keyboard and finished it").  The Court amends the statement to clarify that Ms. Knowles "helped Mr. Murphy draft emails."

[19]    Mr. Murphy proposes the following statement: "When Mr. Murphy goes to William Fales' office to attempt to communicate with him, Mr. Fales does not request the assistance of an interpreter or locate some other communication device.  Instead, Mr. Murphy is forced to 'just do hand gestures . . . [or Mr. Fales will] call Mr. Dalfonso and ask if he knew what was going on.'"  PSAMF ¶ 18 (citing *Fales Dep.* at 26:8–12).  The Secretary interposes a qualification, arguing that the statement that "Mr. Murphy is forced to 'just do hand gestures . . . .'" is argumentative and unsupported by the record citation.  DRPSAMF ¶ 18.  The Court agrees that the statement is unsupported by the record citation.

Mr. Fales testified that Mr. Murphy "would come to my office and just do hand gestures."  *Fales Dep.* at 26:8–9.  Mr. Fales never intimated in his deposition that Mr. Murphy is *forced* to use hand gestures to communicate with him.  Indeed, Mr. Murphy testified that in one-on-one meetings with Mr. Fales following weekly safety meetings, an interpreter is present.  *Murphy Dep. June 2015* at 65:8–11.  Furthermore, Mr. Murphy admitted that he can request an interpreter, although DLA management needs forty-eight hours to process an interpreter request.  *See* PSAMF ¶ 65; *Murphy Dep. June 2015* at 63:3–6.  Accordingly, the record does not support the statement that "Mr. Murphy is

Murphy has also communicated with his third-line supervisor, Donna Shepheard, using hand gestures and written notes, with no interpreter present the majority of the time.[20]   PSAMF ¶ 19; DRPSAMF ¶ 19.   Although Mr. Murphy's supervisors believe that he can "read lips," Mr. Murphy is unable to "read lips" or speech read. PSAMF ¶ 26; DRPSAMF ¶ 26.

Mr. Murphy's supervisors are generally unaware that there is a difference in the syntax, morphology, and semantics between English and ASL.   PSAMF ¶ 28; DRPSAMF ¶ 28.   ASL classes were available to all DLA employees and management. PSAMF ¶ 39; DRPSAMF ¶ 39.   Mr. Fales attended six of the seven classes offered in Basic ASL.[21]   PSAMF ¶ 40; DRPSAMF ¶ 40.   Before Mr. Fales attended the class, he believed that Mr. Murphy could read English; however, over the course of the class,

---

forced" to rely on hand gestures.  Out of an abundance of deference to Mr. Murphy, however, the Court amends the proposed statement to reflect that Mr. Murphy would sometimes communicate with Mr. Fales using hand gestures.

[20]   Mr. Murphy proposes: "Mr. Murphy is required to use hand gestures and written notes to communicate with other supervisors as well, with no interpreter present the majority of the time." PSAMF ¶ 19 (citing *Shepheard Dep.* at 20:9–16).  The Secretary qualifies the statement, pointing out that the record does not support that Mr. Murphy is "required" to communicate with other supervisors without the aid of an interpreter.  DRPSAMF ¶ 19.  Specifically, the Secretary argues that the record citation only refers to Ms. Shepheard and that Ms. Shepheard only had limited interactions with Mr. Murphy which generally concerned the New England Patriots.  *Id.*

The record citation does not support Mr. Murphy's assertion that he is "required" to use hand gestures and written notes to communicate with other supervisors.  *See Shepheard Dep.* at 20:9–16. At most, the record demonstrates that Mr. Murphy communicates with Ms. Shepheard using gestures and notes.  Ms. Shepheard admitted that an interpreter is not present for a majority of their communications but later explained that "generally the conversations that he came to my office were about the Patriots."  *Id.* at 20:20–23.  Nevertheless, drawing all reasonable inferences in favor of Mr. Murphy, the Court amends the statement to reflect that Mr. Murphy used hand gestures and notes to communicate with Ms. Shepheard and that an interpreter was not present the majority of the time.

[21]   Mr. Murphy proposes: "William Fales only attended two or three classes and did not attempt to learn sign language in order to communicate with his employee."  PSAMF ¶ 40.  The Secretary denies the statement, arguing that Mr. Fales attended six of the seven ASL classes offered at the Shipyard.  DRPSAMF ¶ 40.  The Secretary points to the cited deposition of Mr. Fales, as well as the attendance sheet for the "Basic American Sign Language Course" classes held April 9, 2013, through May 28, 2013.  *See Fales Dep.* at 31:5–9; *Decl. of A.U.S.A. Andrew K. Lizotte*, Attach. 11, *Basic ASL Course Attendance Sheet* at 2 (ECF No. 98).  The record supports the Secretary's denial, and the Court adjusts the proposed statement accordingly.

he learned that "the deaf language is . . . like a foreign language." PSAMF ¶ 41; DRPSAMF ¶ 41; *Redacted Document*, Attach. 1, *Tr. of Dep. of William W. Fales, Jr.* at 32:3–5 (ECF No. 91-1) (*Fales Dep.*). Following the course, Mr. Fales was unsure if Mr. Murphy could read or not. PSAMF ¶ 29; DRPSAMF ¶ 29. However, Mr. Fales believed that Mr. Murphy could read English because he knew Mr. Murphy to send and receive emails on his own.[22] PSAMF ¶ 30; DRPSAMF ¶ 30. Despite knowing of Mr. Murphy's limited English abilities, Mr. Murphy's supervisors used written notes to communicate with him.[23] PSAMF ¶ 28; DRPSAMF ¶ 28.

### 2. References to Mr. Murphy's Age and Disability in the Workplace

At some point during the course of his employment with the Navy in the 1980s, Mr. Murphy asked his prior supervisor, Butch Fanjoy, to have an interpreter present at a meeting. Mr. Fanjoy responded, "What do you need an interpreter for? I speak sign language," and he gave Mr. Murphy the middle finger.[24] PSAMF ¶ 45;

---

[22] Mr. Murphy proposes: "William Fales testified that he believes Mr. Murphy can read English because Mr. Murphy sends and received emails, even though he knew that Mr. Murphy received help composing those emails." PSAMF ¶ 30. The Secretary admits that Mr. Fales believes that Mr. Murphy can read English but qualifies the statement to reflect that Mr. Fales also "ha[s] known [Mr. Murphy] to send emails [] by himself." DRPSAMF ¶ 30 (quoting *Fales Dep.* at 106:14–16). The record supports the qualification, and the Court adjusts the statement accordingly.

[23] Mr. Murphy proposes: "Despite not knowing whether Mr. Murphy can read or not, [the supervisors] use written notes as their primary form of communication." PSAMF ¶ 28. The Secretary seeks to qualify the statement, arguing that the record citations merely indicate that Mr. Murphy's supervisors "use written notes as their primary form of communication with [Mr. Murphy] in instances when an interpreter is not present for a scheduled or unscheduled communication." DRPSAMF ¶ 28.

First, Mr. Murphy's record citations only make clear that Mr. Fales did not know whether Mr. Murphy could read or not; the citations say nothing about Mr. Murphy's other supervisors. *See Fales Dep.* at 31:22–23. Moreover, the record citations do not indicate that Mr. Murphy and his supervisors used written notes as their primary form of communication. However, the record does reflect that Mr. Murphy's supervisors knew of his limited English language ability (see footnote three) and nevertheless communicated with him through written notes. *See Murphy Dep. June 2015* at 64:10–11. The Court amends the statement accordingly.

[24] Mr. Murphy's proposed statement does not identify when the incident with Mr. Fanjoy occurred. PSAMF ¶ 45. The Secretary seeks to qualify the statement to clarify that Mr. Fanjoy was

DRPSAMF ¶ 45.  At other unspecified times, Richard Tank, James Orfanides, and other of Mr. Murphy's co-workers gave Mr. Murphy the middle finger and also made signs at Mr. Murphy that translate to "asshole" and "fuck off."[25]  PSAMF ¶ 46; DRPSAMF ¶ 46.  Mr. Murphy's co-workers also tell him to retire because of his age.[26] PSAMF 44; DRPSAMF ¶ 44.  Additionally, at some point between 1999 and 2010, a co-worker named John Green teased him about never receiving a promotion.[27] PSAMF ¶ 43; DRPSAMF ¶ 43.

### 3.    Lack of Accommodations for Mr. Murphy's Disability

Hearing individuals often improperly assume that deaf individuals cannot perform certain jobs because having speech and being articulate is considered equivalent to being intelligent.  PSAMF ¶ 42; DRPSAMF ¶ 42.  As of 2013, the Shipyard had not held any specific deaf-awareness trainings, other than a short video

---

Mr. Murphy's supervisor in the 1980s when Mr. Murphy worked for the Navy.  DRPSAMF ¶ 45 (citing *Murphy Interrogs. I* at 9).  The record supports the qualification, and the Court amends the statement accordingly.

[25]    The record citation associated with Mr. Murphy's proposed statement does not identify when the incidents with Mr. Murphy's co-workers occurred.  PSAMF ¶ 46 (citing *Knowles Decl.* ¶ 7).  The Secretary seeks to qualify the statement to clarify that the incidents occurred at certain unidentified instances.  DRPSAMF ¶ 46.  The record supports the qualification, and the Court adjusts the statement.

[26]    Mr. Murphy proposes: "Mr. Murphy's co-workers tell him to retire because he's '72.'"  PSAMF ¶ 44 (citing *Murphy Dep. Aug. 2015* at 64:23–65:1).  The Secretary denies the statement as unsupported by the record citation.  The cited portion of Mr. Murphy's deposition reads, "I mean, now I'm what?  72.  I mean, I don't—now I am getting older, you know.  And they keep saying, oh, retire. They're like, oh, retire.  And I'm like 72, I'm a great worker I'm—I know, I know.  I've got to keep fighting the fight."  *Murphy Dep. Aug. 2015* at 64:21–65:1.  Although the record does not explicitly state that Mr. Murphy's co-workers tell him to retire "because" is his 72, the Court concludes that it is reasonable to infer that his co-workers tell him to retire due to his age.

[27]    Mr. Murphy proposes: "Mr. Murphy was teased by his co-workers about never receiving a promotion."  PSAMF ¶ 43.  The Secretary qualifies the statement because it does not specify a time period.  DRPSAMF ¶ 43.  The record indicates that an individual named John Green teased him about not receiving a promotion at some point between 1999 and 2010.  *See Murphy Dep. June 2015* at 52:10–20; *Murphy Interrogs. I* at 9–10.  The Court adjusts the statement accordingly.

in 2012.  PSAMF ¶ 47; DRPSAMF ¶ 47.  Mr. Fales never received any training on how to effectively supervise a deaf employee.  PSAMF ¶ 48; DRPSAMF ¶ 48.

Mr. Murphy's first-line supervisor, Anthony Dalfonso, never heard of any discussions regarding providing Mr. Murphy with reasonable accommodations. PSAMF ¶ 49; DRPSAMF ¶ 49.  Mr. Murphy requested that fire alarm lights—in addition to just a noise based alarm—be installed in the men's bathroom; management is still unsure whether safety lights have been installed.  PSAMF ¶ 50; DRPSAMF ¶ 50.  When Mr. Murphy told Mr. Fales that he needed to be informed of the same safety information that was provided to his co-workers, Mr. Fales nodded his head but did nothing about Mr. Murphy's request.  PSAMF ¶ 51; DRPSAMF ¶ 51.

Mr. Murphy also requested a reasonable accommodation for a forklift license in 2010.  PSAMF ¶ 52; DRPSAMF ¶ 52.  Mr. Murphy was told that he could not have a forklift license because he was deaf.  PSAMF ¶ 53; DRPSAMF ¶ 53.  Five years after the forklift license reasonable accommodation request was made, DLA management still had not addressed the request.  PSAMF ¶ 54; DRPSAMF ¶ 54. With regard to this request, Mr. Gambrell, the DLA EEO Disability Program Manager, stated: "We . . . were looking at trying to determine what was going on with the forklift license . . . and the fact [was] there were medical limitations and the documentation provided regarding the ability to step up, use ladders, lift, [and] bend . . . may be impacting the forklift license."  PSAMF ¶ 55; DRPSAMF ¶ 55.  Mr. Gambrell also stated: "What I recall . . . is [Mr. Murphy] was unable to step up onto a forklift because of the height and there are restrictions on climbing for [Mr.

Murphy]."    PSAMF ¶ 56; DRPSAMF ¶ 56.    However, Mr. Murphy's medical evaluation, completed by Dr. Edward McAbee on April 24, 2012, states that while Mr. Murphy should not lift or bend, he was able to climb up steps, and that Mr. Murphy's "medical problem should not interfere with his qualifying for a forklift license." PSAMF ¶ 57; DRPSAMF ¶ 57.

Mr. Murphy has also requested help with respect to interpretation services. PSAMF ¶ 64; DRPSAMF ¶ 64.    The DLA requires forty-eight hours to schedule an interpreter, although some supervisors erroneously believe the notice requirement is seventy-two hours.    PSAMF ¶ 65; DRPSAMF ¶ 65.    When there are last minute meetings and there is no interpreter, Mr. Murphy cannot participate.    PSAMF ¶ 63; DRPSAMF ¶ 63. Mr. Murphy has informed his supervisors that he cannot participate in meetings unless an interpreter is present, but he felt that his requests for help in this regard have been brushed aside or briefly addressed with no follow through.[28] PSAMF ¶ 64; DRPSAMF ¶ 64.    Mr. Murphy has been told that interpreters are expensive.    PSAMF ¶ 64; DRPSAMF ¶ 64.    When Mr. Murphy asked for an interpreter to be present at a meeting or social outing, he was told, "Why don't you just teach everyone sign language?"    PSAMF ¶ 67; DRPSAMF ¶ 67.    Mr. Fales never

---

[28]     Mr. Murphy proposes: "Mr. Murphy's interpreter requests have been brushed aside or briefly addressed with no follow through, with an excuse being that interpreters are expensive."    PSAMF ¶ 64.    The Secretary denies the statement, contending that it is argumentative.    DRPSAMF ¶ 64.    The record states that Mr. Murphy is unable to participate in meetings without an interpreter, and that his requests for help with respect to interpretive services "have been brushed aside or briefly addressed with no follow through."    *Murphy Interrogs. I* at 14.    The record also reflects that Mr. Murphy was told that "interpreters are expensive."    *Id.*    To address the Secretary's concern, the Court adjusted the statement to reflect that Mr. Murphy felt his requests were brushed aside, not that they were in fact brushed aside.

independently contacted an interpreter during conversations with Mr. Murphy that were outside the context of the weekly meetings.  PSAMF ¶ 66; DRPSAMF ¶ 66.

Furthermore, certain means of communication, such as Video Remote Interpreting, are not the right tool or the proper accommodation for every deaf individual.  PSAMF ¶ 69; DRPSAMF ¶ 69.  The DLA has two videophones on site; although neither one is located in Mr. Murphy's work area, they are located "close to" Mr. Murphy.[29]  PSAMF ¶ 70; DRPSAMF ¶ 70.  The DLA does not use the video phone or the video relay services often to communicate with Mr. Murphy.  PSAMF ¶ 72; DRPSAMF ¶ 72.  The management does not know how a video phone works, contributing to the underutilization of the video phones.  PSAMF ¶ 73; DRPSAMF ¶ 73.  The primary means of communication between Mr. Murphy and hearing individuals is through written notes or, less often, through an interpreter.  PSAMF ¶ 74; DRPSAMF ¶ 74.

### 4.   Lack of Responsiveness to Deaf Affinity Group Concerns

The Affinity Group is a group of deaf employees at the Shipyard that was formed to address the need for accommodations for deaf employees at the Shipyard, including accommodations needed to access USA Jobs/USA Staffing, the on-line application portal for promotions within the DLA.  PSAMF ¶ 75; DRPSAMF ¶ 75. Mr. Murphy's expert witness testified that it would be very important for

---

[29]     Mr. Murphy states that "The Defendant has two videophones on site, but neither one is located in Mr. Murphy's work area."  PSAMF ¶ 70 (citing *Spitz Dep.* at 72:19–24).  The Secretary seeks to qualify the statement to clarify that Mr. Murphy testified that two of the video phones are "close to where I am."  DRPSAMF ¶ 70 (citing *Murphy Dep. June 2015* at 72:21–78:15).  The record supports the qualification, and the Court amends the statement accordingly.

management to discover what issues deaf employees have by attending Affinity Group meetings at the Shipyard. PSAMF ¶ 76; DRPSAMF ¶ 76.

Ms. Shepheard, Mr. Murphy's third-line supervisor, does not know why the Affinity Group was formed. PSAMF ¶ 77; DRPSAMF ¶ 77. Ms. Shepheard never attended an Affinity Group meeting because "the management was not involved [and] did not go to the Deaf Affinity Group meetings," even though she knew Mr. Murphy "had a concern that we were not attending the Deaf Affinity Group meetings." PSAMF ¶ 78; DRPSAMF ¶ 78. Sheri Kelley, a DLA EEO Specialist, only attended one to three Affinity Group meetings. PSAMF ¶ 79; DRPSAMF ¶ 79. Mr. Dalfonso has never been to an Affinity Group meeting. PSAMF ¶ 80; DRPSAMF ¶ 80. Mr. Gambrell never attended an Affinity Group meeting. PSAMF ¶ 81; DRPSAMF ¶ 81.

Mr. Fales believes he attended somewhere between three to eight meetings, but he stopped attending after he told his supervisor, "I think I'm out of my league here as far as attending these meetings." PSAMF ¶ 82; DRPSAMF ¶ 82. Mr. Fales did not follow-up on the issues discussed at the Affinity Group meetings, including: whether deaf employees should have stickers on their hard hats to indicate that they are deaf in case of emergency situations or fires; how deaf employees can receive feedback regarding active shooter drills; how employees can raise issues regarding communication with supervisors; and how deaf employees can provide feedback on video remote interpreting. PSAMF ¶ 83; DRPSAMF ¶ 83. Mr. Fales testified that the Affinity Group meetings at the Shipyard were a "bitch session." PSAMF ¶ 84; DRPSAMF ¶ 84.

### D.    Mr. Murphy's Failure to Obtain a Promotion

Mr. Murphy has an excellent employment record: he consistently receives positive performance reviews and feedback from his supervisors and has received a number of awards and recognition for his hard work.  PSAMF ¶¶ 2–4; DRPSAMF ¶¶ 2–4.  He has helped train newer and less experienced co-workers, including co-workers who are not disabled and who are much younger than he is.  PSAMF ¶ 5; DRPSAMF ¶ 5.

Despite Mr. Murphy's excellent work ethic, Mr. Murphy has never been given a promotion at the Shipyard, either during his tenure with the Navy from 1979 until 2010 or with the DLA from 2010 to the present.  PSAMF ¶¶ 85, 99; DRPSAMF ¶¶ 85, 99.  Mr. Murphy has the longest length of experience in the Supply Department of the twelve individuals currently stationed there.  PSAMF ¶ 86; DRPSAMF ¶ 86.  Only four DLA employees in the Supply Department, including Mr. Murphy, have more than thirty-five years of employment.[30]  PSAMF ¶ 87; DRPSAMF ¶ 87.  Of these four employees, only Mr. Murphy has never been promoted.  PSAMF ¶ 88; DRPSAMF ¶ 88.  For over thirty-five years, Mr. Murphy has consistently expressed his desire to be promoted to his supervisors, co-workers, EEO Specialists, Shipyard counsel, and others.  PSAMF ¶ 100; DRPSAMF ¶ 100.  From 2007 to September 2013, Mr. Murphy

---

[30]    Mr. Murphy proposes: "Only four DLA employees have more than 35 years of employment at the entire Shipyard[.]"  PSAMF ¶ 87.  The Secretary qualifies the statement, explaining that the Secretary was only ordered to produce employment data regarding DLA personnel in the Supply Department.  DRPSAMF ¶ 87 (citing *Report of Hr'g and Order Re: Disc.* at 4 (ECF No. 27)).  Therefore, the four individuals that Mr. Murphy references were not those who had more than thirty-five years of employment "at the entire Shipyard."  *Id.*  Upon review of the discovery order, the Court agrees with the Secretary and amends the statement to reflect that there are only four DLA employees in the Supply Department with more than thirty-five years of employment.

expressed his desire to be promoted to his supervisors at least nineteen times. PSAMF ¶ 89; DRPSAMF ¶ 89.  Mr. Murphy's supervisors are aware that not being promoted has been a longstanding concern for Mr. Murphy.  PSAMF ¶ 101; DRPSAMF ¶ 101.  Mr. Murphy has gone to his third-line supervisor, Ms. Shepheard, "on and off" over the years about not being promoted.  PSAMF ¶ 103; DRPSAMF ¶ 103.

Mr. Murphy was told many times that he would never be promoted.[31]  PSAMF ¶ 90; DRPSAMF ¶ 90.  In particular, Mr. Fales, Mr. Murphy's current second-line supervisor, told Mr. Murphy that he would "never get promoted because he was deaf."[32]  PSAMF ¶ 94; DRPSAMF ¶ 94.  Additionally, at some point in the 1980s, Mr.

---

[31]     The Secretary qualifies this statement, as well as PSAMF ¶¶ 91–93, to clarify the relevant time frames. DRPSAMF ¶ 90–93.  The Secretary argues that based on Mr. Murphy's testimony, the incident with Butch Fanjoy occurred at some point in the 1980s (citing *Murphy Interrogs. I* at 3, 9); the incident with John Green occurred "in or about 2009 or 2010" (citing *Murphy Interrogs. I* at 9–10); and the incident with George Stamos occurred sometime between 2002 and 2012 (citing *Murphy Dep. June 2015* at 54:5–56:5).  The record supports the qualifications, and the Court amends the statements accordingly.

[32]     Mr. Murphy proposes: "William Fales, Mr. Murphy's current second-line supervisor, also told Mr. Murphy that he would 'never get promoted because he was deaf.'"  PSAMF ¶ 94 (citing *Murphy Interrogs. I* at 10; *Murphy Dep. Aug. 2015* at 56:9–12).   The Secretary denies the statement. DRPSAMF ¶ 94.  In his responses to the Secretary's first set of interrogatories on June 15, 2015, Mr. Murphy stated that "Bill Fales has also told me that I would 'never get promoted.'"  *Murphy Interrogs. I* at 10.  However, during his first deposition on June 23, 2015, Mr. Murphy testified that Mr. Fales did not tell him that he would never get promoted.  *See Murphy Dep. June 2015* at 48:7–9 ("Q: When did Bill Fales . . . tell you you would never get promoted?  A: He didn't.").

During his second deposition, Attorney Lizotte showed Mr. Murphy his interrogatory statement that asserted that Mr. Fales told Mr. Murphy that he would "never get promoted."  *Murphy Dep. Aug. 2015* at 55:4–16.  After looking at the statement, Mr. Murphy stated, "Yes. He did tell me that. That statement is true."  *Id.* at 55:21–22.  Somewhat confusingly, Attorney Lizotte then asked, "[D]id Bill Fales ever say to you[,] you would never get promoted *because you're deaf?*"  *Id.* at 56:9–10 (emphasis added).  Mr. Murphy responded, "Yes, yes."  *Id.* at 56:11.

The Court is satisfied that the record establishes that Mr. Fales told Mr. Murphy that he would never be promoted.  However, the record is not crystal clear that Mr. Fales told Mr. Murphy that he would never be promoted "because he was deaf."  Mr. Murphy's own sworn statements contradict each other on this point.  Nevertheless, because the Court is required to view the evidence in the light most favorable to Mr. Murphy and because it is possible that a reasonable factfinder could believe Mr. Murphy when he stated in his second deposition that Mr. Fales had told him that he would never be promoted because he is deaf, the Court accepts this version for purposes of this motion.

23

Murphy's then-supervisor, Butch Fanjoy, told Mr. Murphy that he would never get promoted.  PSAMF ¶ 91; DRPSAMF ¶ 91.  At some point between 2002 and 2012, George Stamos, one of Mr. Murphy's prior supervisors, told him that he was "stuck at this level."  PSAMF ¶ 93; DRPSAMF ¶ 93.  In 2008 or 2009, another prior supervisor, John Green, told Mr. Murphy that he was going to be promoted to a GS-07 position but then told Mr. Murphy that he was "just kidding" about the promotion. PSAMF ¶ 82; DRPSAMF ¶ 82.  Mr. Murphy was frustrated because John Green and George Stamos had failed to follow through on their promises to promote him. PSAMF ¶ 102; DRPSAMF ¶ 102.

Mr. Murphy's first-line supervisor, Mr. Dalfonso, does not know of any employee who has been a WG-06 worker for as long as Mr. Murphy.  PSAMF ¶ 95; DRPSAMF ¶ 95.  According to Mr. Dalfonso, there is essentially no difference in work responsibility between the lesser paid WG-06 position and the higher paid GS-07 position in the Supply Department; however, going from a WG-06 position to a GS-07 position is considered a promotion.  PSAMF ¶ 96; DRPSAMF ¶ 96.  Mr. Dalfonso does not know of any reason why Mr. Murphy should not be promoted.  PSAMF ¶ 97; DRPSAMF ¶ 97.  Similarly, Ms. Shepheard believes that Mr. Murphy would be able to perform the functions of a higher-paid Supply Technician.  PSAMF ¶ 98; DRPSAMF ¶ 98.

In 1991, despite his hard work and seniority, Mr. Murphy was denied a promotion as an Inventory Management Specialist.  PSAMF ¶ 104; DRPSAMF ¶ 104. After applying in 1991, Mr. Murphy sought a promotion by applying to at least thirty-

six positions over the fifteen-year period from 2000 to 2015.   PSAMF ¶ 105; DRPSAMF ¶ 105.

### E.    Mr. Murphy's 2013 General Supply Specialist Application

#### 1.    USA Jobs/USA Staffing

The DLA uses a web-based talent acquisition system called USA Jobs to recruit non-federal government employees for open DLA positions.  DSMF ¶ 33; PRDSMF ¶¶ 33.  Applicants who already hold federal government employment apply to open DLA positions through USA Staffing, a web-based system that interfaces with USA Jobs.  *Id.*  With limited exceptions—such as for temporary promotions of 120 days or less or for promotions based on negotiated EEO settlements—DLA employees who were seeking a promotion to an open DLA position in 2013 were required to apply through USA Staffing.[33]   DSMF ¶ 34; PRDSMF ¶ 34; PSAMF ¶ 134; DRPSAMF ¶ 134.

Employees can learn about job openings through announcements, written in English, on the USA staffing website.[34]  PSAMF ¶ 116; DRPSAMF ¶ 116.  Sometimes,

---

[33]     The Secretary proposes: "To be selected for a DLA promotion Plaintiff was required to apply for open positions."  DSMF ¶ 31.  Similarly, he asserts, "Plaintiff could only receive a promotion in connection with DLA jobs to which he applied to electronically."  DSMF ¶ 32.  Mr. Murphy denies both statements, alleging that "DLA employees can be promoted in multiple ways."  PRDSMF ¶¶ 31–32.  Mr. Murphy's record citations reflect that DLA employees can receive temporary promotions of up to 120 days and can receive promotions based on negotiated EEO settlements without applying through the USA Staffing system.  *See Gambrell Dep.* at 90:22–91:4; *Dep. of Charlee Swingle* at 42:10–13 (ECF No. 77) (*Swingle Dep.*); *Fales Dep.* at 63:21–64:6; *Shepheard Dep.* at 48:13–49:1.  The Court omits the Secretary's statements and amends DSMF ¶ 34 to reflect these exceptions.
      Mr. Murphy also seeks to qualify DSMF ¶ 34 by citing depositions of DLA employees who obtained promotions without applying through the USA Staffing system.  *See* PRDSMF ¶ 34.  However, these individuals applied for their promotions before USA Staffing existed.  The Secretary's statement explicitly refers to DLA employees applying for open positions in 2013, when the USA Staffing system was in operation.  Accordingly, the Court rejects the qualification.
[34]     Mr. Murphy proposes: "Employees can only officially learn about job openings through announcements, written in English, on the USA Jobs website."  PSAMF ¶ 116.  The Secretary qualifies

Mr. Fales notified employees of openings through emails, written in English.  PSAMF ¶ 117; DRPSAMF ¶ 117.  Mr. Fales also brought up job openings at weekly safety meetings.[35]  DRPSAMF ¶ 108.  However, at certain points over the years, Mr. Murphy's supervisors would notify his younger, non-disabled co-workers when there were job openings or promotion opportunities, but they would not let Mr. Murphy know about these opportunities.  PSAMF ¶ 108; DRPSAMF ¶ 108.  Sometimes, Mr. Murphy's co-workers would forward emails about job openings or promotion opportunities to him.  PSAMF ¶ 109; DRPSAMF ¶ 109.  On many occasions, Mr. Murphy emailed the Human Resources Office directly to express his interest in the positions.  PSAMF ¶ 110; DRPSAMF ¶ 110.  Mr. Murphy generally would not receive a response, or the response would be a "no."  PSAMF ¶ 111; DRPSAMF ¶ 111.

To apply for a job opening through USA Staffing, DLA employees complete an electronic questionnaire.  DSMF ¶ 35; PRDSMF ¶ 35.  For some questions, applicants select answers from a drop-down menu that generally contains five answer choices.  PSAMF ¶ 120; DRPSAMF ¶ 120.  The questionnaire also asks the applicants to rate themselves as "proficient, expert, some knowledge, full knowledge."  PSAMF ¶ 121;

---

the statement, arguing that the record citation does not support the contention that employees can "only officially" learn about job openings through postings on the USA Staffing website.  DRPSAMF ¶ 116.  A review of the record citations supports the Secretary's position.  Moreover, Mr. Murphy cites the deposition of Charlee Swingle, who testified that job announcements are not only published on the USA Staffing website, but they are also sent to the official who requested applicants to fill the vacancy.  *Swingle Dep.* at 38:7–18.  To that effect, Ms. Shepheard testified that Mr. Murphy's second-line supervisor, Mr. Fales, would bring up job openings at the weekly safety meetings, which typically were translated.  *See Shepheard Dep.* at 49:16–50:13.  Accordingly, the Court adjusts the statement to remove the assertion that employees can "only officially" learn of job openings on the USA Staffing website.

[35]     The Secretary offers a qualified response to PSAMF ¶ 108 to clarify that Ms. Shepheard testified that Mr. Fales also notified individuals of job openings at weekly safety meetings.  DRPSAMF ¶ 108 (citing *Shepheard Dep.* at 49:17–50:13).  The record supports the qualification.

DRPSAMF ¶ 121.   As an example, the questionnaire asks applicants to choose between two different options regarding their knowledge, skills, and abilities:

> (1) "I have performed this task as a regular part of my job.  I have performed it independently and normally without review by a supervisor or senior employee."
>
> (2) "I have performed this task on the job.  My work was monitored closely by a supervisor or senior employee to ensure compliance with proper procedures."

PSAMF ¶ 122; DRPSAMF ¶ 122.  Based on the applicants' answers, the electronic system generates a numerical ranking.  DSMF ¶ 35; PRDSMF ¶ 35.  The DLA then reviews the ranking to determine which DLA job applicants are qualified for the positions to which they applied and which candidates to interview.  *Id.*

Mr. Murphy's supervisors admit that the USA Staffing application process is difficult to access and understand.  PSAMF ¶ 113; DRPSAMF ¶ 113.  Mr. Murphy's supervisors and some members of the DLA EEO do not thoroughly understand the USA Staffing application process, including what information Mr. Murphy needed to provide in order to successfully apply.  PSAMF ¶ 130; DRPSAMF ¶ 130.  The USA Staffing website and application questionnaire are written in college-level English.  PSAMF ¶ 115; DRPSAMF ¶ 115.  This makes it essentially inaccessible for someone like Mr. Murphy, whose reading, writing, and vocabulary in English are quite limited.[36],[37]  PSAMF ¶ 114; DRPSAMF ¶ 115.

---

[36]   Mr. Murphy proposes: "USA Jobs…is essentially inaccessible for someone like Mr. Murphy, who does not speak, read, or comprehend English."  PSAMF ¶ 114.  The Secretary reasserts the response discussed in footnote three.  For the reasons set forth in that footnote, the Court adjusts the statement to reflect that Mr. Murphy's English language skills are quite limited.

[37]   Mr. Murphy proposes: "Because the Defendant's job application process is essentially inaccessible for someone like Mr. Murphy who communicates in ASL; he was unable to effectively apply for a promotion."  PSAMF ¶ 124.  The Secretary denies the statement as comprising nothing

If applicants have questions during the USA Staffing application process, they can reach out to a Human Resources specialist by phone or email; no similar assistance is provided to deaf individuals.  PSAMF ¶ 118; DRPSAMF ¶ 118.  Some of Mr. Murphy's supervisors and members of the DLA EEO believe that, despite the website being written in English, the USA Jobs application process should not be more difficult to understand if the applicant communicates in ASL or is not fluent in English.  PSAMF ¶ 119; DRPSAMF ¶ 119.

The Shipyard arranged an ASL USA Staffing training and instructed the participants on how to navigate the online system.[38]  PSAMF ¶ 131; DRPSAMF ¶ 131.  Mr. Murphy did not attend this training because he was sick.  PSAMF ¶ 132; DRPSAMF ¶ 132.  The Shipyard informed Mr. Murphy that the ASL USA Staffing navigation training would be rescheduled so that he could attend; however, the training was never rescheduled.  *Id.*  DLA management received negative feedback about the ASL USA Staffing navigation training that it did hold.  PSAMF ¶ 133; DRPSAMF ¶ 133.  No one, however, attempted to reconstruct and reschedule the training.  *Id.*

### 2.   Mr. Murphy Applies Using the USA Staffing Website

---

more than "conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative."  DRPSAMF ¶ 124 (quoting *Rogan*, 267 F.3d at 27).  The Court agrees that the statement is conclusory and notes that the facts underlying the statement appear elsewhere in the summary judgment facts.  Therefore, the Court omits the statement.

[38]     Mr. Murphy also proposes: "The instructors, however, did not request the ASL translators to translate the application questionnaires for the participants."  PSAMF ¶ 131 (citing *Gambrell Dep.* at 96:13–14; *Kelley Dep.* at 71:8–10; *Shepheard Dep.* at 60:13–17, 109:22–24).  The Secretary qualifies the statement as unsupported by Mr. Murphy's record citations.  Mr. Murphy's record citations do not address whether the instructors requested ASL translators to translate the application questionnaires for the participants, and therefore the Court omits the statement.

Mr. Murphy has been told repeatedly that he must apply through USA Staffing in order to be promoted. PSAMF ¶ 135; DRPSAMF ¶ 135. However, Mr. Murphy did not realize that he had to apply for a promotion using the USA Staffing system until approximately five years ago.[39]   PSAMF ¶ 112.   The first time in 2013 that Mr. Murphy submitted an application for a promotion was on May 4, for the position of Distribution Facilities Specialist.[40,41]   DSMF ¶ 36; PRDSMF ¶ 36.   On May 9, 2013,

[39]     The Secretary denies this statement, arguing that it is unsupported by the record citation. DRPSAMF ¶ 112. Mr. Murphy cites the deposition of Ms. Shepheard, who testified that approximately five years ago, she spoke with Mr. Murphy's second-line supervisor, Mr. Fales, about Mr. Murphy's complaints that he was not being promoted. *Shepheard Dep.* at 26:13–21. Ms. Shepheard testified that when she looked into it, she learned that Mr. Murphy's name was not appearing on the human resource department's register of candidates, which either meant that Mr. Murphy was not applying for jobs or that he was applying but was not certified for the positions to which he was applying. *Id.* at 27:10–17.   The Court is tasked with drawing all reasonable inferences in favor of Mr. Murphy. Viewing the facts in the light most favorable to Mr. Murphy, the Court concludes that it is reasonable to infer from Ms. Shepheard's testimony that Mr. Murphy was not applying for promotions approximately five years ago because he did not realize that he needed to use the USA Staffing system.

[40]     Mr. Murphy seeks to qualify the statement to clarify that the application date was April 25, 2013. PRDSMF ¶ 36 (citing *Murphy Interrogs. I* at 4). After a review of the parties' record citations, it appears that April 25 was the date when the job was posted. *See Murphy EEO Decl.* at 6. A USA Staffing print-out reflects that Mr. Murphy applied to the position on May 4, 2013. *Id.* at 12. Accordingly, the Court rejects Mr. Murphy's qualification.

[41]     Mr. Murphy proposes: "Mr. Murphy did not understand the USA Jobs application, which was written in English, and he sought help from his supervisors." PSAMF ¶ 127 (citing *Murphy Dep. August 2015* at 29:18–21). Additionally, Mr. Murphy proposes: "When Mr. Murphy told his second-line supervisor, William Fales, that he didn't understand the application on the USA Jobs website, Mr. Murphy was told that he needed to pass the application before he would be given any job coaching assistance." PSAMF ¶ 128 (citing *Murphy Dep.* Aug. 2015 at 29:18–30:2). The Secretary qualifies the statements to highlight the ambiguity of the testimony that Mr. Murphy cites.

        Mr. Murphy cites his deposition, in which he testified, "I did get the application. I told [Mr. Fales], and I said, well, what exactly is all of this? Some of it I understand, but I said, some of it I need some help with." *Murphy Dep. August 2015* at 29:18–21. The Court omits the statement because it is unable to determine when Mr. Murphy and Mr. Fales had this exchange or what application Mr. Murphy was referring to. When asked when Mr. Murphy had the conversation, Mr. Murphy replied, "One month ago . . . when I failed to get that job, I said—I sent a letter off; and they got it. And that's when—that was a month ago." *Id.* at 31:6–11. If true, that would mean that Mr. Murphy's request for help occurred well after the events at issue in this lawsuit. The Court simply does not know; the record is too ambiguous.

        Additionally, the Court is hesitant to rely on Mr. Murphy's testimony in this instance because Mr. Murphy's own attorney questioned its accuracy at the deposition. Shortly after Mr. Murphy testified about the one-month time frame, Mr. Murphy's attorney called for a recess. Once back on the record, she stated, "[T]here is a significant lack of understanding on the part of my client just because of the barriers that present [themselves] given the English language and the translation through ASL . . . At this point I don't think the record is accurate because of this misunderstanding." *Id.* at 32:7–

Mr. Murphy was informed that he had not been selected to interview for the position. DSMF ¶ 37; PRDSMF ¶ 37.   Next, Mr. Murphy submitted an application for the position of General Supply Specialist on August 16, 2013, at both the GS-07 and GS-09 levels.[42]   DSMF ¶ 38; PRDSMF ¶ 38.   Although Mr. Murphy has made numerous attempts to obtain a promotion throughout his career at the Shipyard, his August 2013 application to the General Supply Specialist position is the only specific instance he cites in his Second Amended Complaint.[43]   DSMF ¶ 39; PRDSMF ¶ 39.

The DLA General Supply Specialist position was posted on the USA Staffing system on August 9, 2013, for both the GS-07 and GS-09 levels.   DSMF ¶ 40; PRDSMF ¶ 40.   Mr. Murphy applied for both the GS-07 and GS-09 positions on August 16,

---

25.   Yet even after the recess, the parties never clarified when Mr. Murphy asked for help on his application, or what application Mr. Murphy was referring to in his conversation with Mr. Fales. Because the record is ambiguous, and because of the admittedly high potential for inaccuracy, the Court omits the statements as too ambiguous to be probative.

[42]   Mr. Murphy qualifies the statement, explaining that he applied to another Distribution Facilities Specialist position on April 29, 2013, and again on August 9, 2013, and that he applied for a Supply Technician position on November 21, 2013.   PRDSMF ¶ 38 (citing *Murphy Interrog. I* at 4–5). He also states that he asked for a promotion and asked for help with a promotion fifteen times in 2013. *Id.* (citing *Pl.'s Answers to Def.'s Second Set of Interrogatories* at 4–5 (ECF No. 84) (*Murphy Interrogs. II*)).

First, as the Court discussed in the preceding footnote, a USA Staffing print-out reflects that Mr. Murphy applied to the Distribution Facilities Specialist position on May 4, 2013.   Additionally, the print-out and Mr. Murphy's own interrogatory answers reflect that he applied to a General Supply Specialist position in August 2013, not a Distribution Facilities Specialist position.   *See Murphy EEO Decl.* at 12; *Murphy Interrogs. I* at 4.   The print-out also confirms that he applied on August 16, not August 9.   *See Murphy EEO Decl.* at 12.   The remainder of Mr. Murphy's qualification is beyond the scope of the Secretary's statement of fact and is addressed elsewhere in the Court's factual statement. Therefore, the Court omits the qualification.

[43]   In his proposed statement, the Secretary states, "Plaintiff's application for the position of General Supply Specialist . . . in August 2013 is the most recent—and only—example alleged of his attempts at promotion."   DSMF ¶ 39.   Mr. Murphy denies the statement, arguing that "Mr. Murphy attempted to be promoted, not a mere 2 times, but at least 38 times from 1991 to 2015."   PRDSMF ¶ 39.   The Secretary is referring to Mr. Murphy's Second Amended Complaint, while Mr. Murphy's response discusses his employment history in general.   The Court amends the statement to reflect that the August 2013 application to the General Supply Specialist position is the only specific example that Mr. Murphy provided in his Second Amended Complaint.   *See Second Am. Compl.* ¶ 27.   However, the Court also amends the statement to acknowledge that Mr. Murphy has made "numerous attempts to obtain a promotion" during his employment at the Shipyard.   *See id.* ¶ 20.

30

2013.  DSMF ¶ 41; PRDSMF ¶ 41.  To apply for the positions, Mr. Murphy electronically filled out and submitted answers to a questionnaire on the USA Staffing system.[44]  DSMF ¶ 42.

Mr. Murphy was unable to complete the application accurately on his own. PRDSMF ¶ 42.  For instance, the electronic questionnaire contained the following question:

> 6. I am applying for this position to be considered as a:
>
> Person with Disabilities.  You must submit a certification statement from a Vocational Rehabilitation Service (state or private), Department of Veterans Affairs, a licensed medical professional (e.g., a Physician or other medical professional duty certified by a State, the District of Columbia, or a U.S. territory, to practice medicine or provide disability benefits.
>
> A. Yes
> B. No.

DSMF ¶ 43; PRDSMF ¶ 43.  Mr. Murphy answered "B. No" to Question Number 6 of the General Supply Specialist questionnaire.  DSMF ¶ 61; PRDSMF ¶ 61.  Question Number 6 of the questionnaire was the only solicitation of, or reference to, information regarding disabilities.  DSMF ¶ 44; PRDSMF ¶ 44.  The questionnaire did not seek or make any reference to the applicants' ages.  DSMF ¶ 44; PRDSMF ¶ 44.

---

[44]     Mr. Murphy qualifies the statement to point out that "Mr. Murphy . . . was provided with no assistance despite his disability and his inability to read English, and was unable to accurately complete the application."  PRDSMF ¶ 42.  The record reflects that Mr. Murphy is deaf and has a very limited English reading and writing skills.  The record also reflects that the USA Staffing is written in college-level English.  PSAMF ¶ 115; DRPSAMF ¶ 115.  It is therefore reasonable to infer that Mr. Murphy would be unable to accurately complete the application on his own.

The USA Staffing system used the applicants' answers to the General Supply Specialist questionnaire to automatically generate a score of between 70 and 100. DSMF ¶ 46; PRDSMF ¶ 46. This score then automatically generated a ranking list of the applicants, from the highest score to the lowest score. DSMF ¶ 47; PRDSMF ¶ 47. DLA Human Resources Specialist Lori Kendrick was the DLA contact for the General Supply Specialist job announcement at both the GS-07 and GS-09 levels. DSMF ¶ 48; PRDSMF ¶ 48.

### 3. Mr. Murphy Is Not Selected for the GS-07 General Supply Specialist Position

Ms. Kendrick was the only DLA employee responsible for reviewing the ranking list for the General Supply Specialist position at the GS-07 grade and determining which applications merited further review. DSMF ¶ 49; PRDSMF ¶ 49. The ranking list for the General Supply Specialist position at the GS-07 list included information that Mr. Murphy entered, as well as the eligibilities he selected and his cumulative score based on his answers.[45] DSMF ¶ 50; PRDSMF ¶ 50. Ms. Kendrick reviewed the ranking list, made handwritten notations, and initialed the document. DSMF ¶ 51; PRDSMF ¶ 51. Ms. Kendrick used a cut-off score of 88 out of 100 to determine which applicants to refer to have their resumes and applications reviewed for an interview for the General Supply Specialist position at the GS-07 level. DSMF ¶ 52; PRDSMF ¶ 52. Ms. Kendrick indicated this cut-off score by drawing a line on the ranking list separating the applicants who scored an 88 from those who scored an

---

[45]     See footnote forty-four.

87.  DSMF ¶ 53; PRDSMF ¶ 53.  She did not review the application materials of any candidate with a score of 87 or lower.  DSMF ¶ 54; PRDSMF ¶ 54.

Mr. Murphy's answers to the General Supply Specialist questionnaire automatically generated a score of 85, which was below the cut-off.  DSMF ¶ 55; PRDSMF ¶ 55.  Ms. Kendrick therefore did not review Mr. Murphy's application materials or consider him for referral for an interview.  DSMF ¶ 56; PRDSMF ¶ 56. The only information Ms. Kendrick possessed and reviewed concerning Mr. Murphy was that contained on the ranking list: his name, address, telephone number, email address, the last four digits of his social security number, that he was a candidate for competitive promotion ("C-PROM"), and that he scored an 85.  DSMF ¶ 57; PRDSMF ¶ 57.

If Mr. Murphy had answered "A. Yes" to Question Number 6 of the General Supply Specialist questionnaire indicating that he had applied as a Person with Disabilities, the ranking list would have indicated a designation of "N-PWD" beside his name.  DSMF ¶ 59; PRDSMF ¶ 59.  Because Mr. Murphy answered "B. No" to Question Number 6 of the questionnaire, a designation of "N-PWD" was not present beside Mr. Murphy's ranking information.  DSMF ¶ 58; PRDSMF ¶ 58.  Even with a score below the 88 cut-off, had he self-identified as N-PWD, Mr. Murphy's application for General Supply Specialist at the GS-07 grade would have received additional review by Ms. Kendrick.  DSMF ¶ 60; PRDSMF ¶ 60; PSAMF ¶ 126; DRPSAMF ¶ 126.  If the ranking list indicated that he was N-PWD, his resume would have been reviewed and his application would have been forwarded to the selecting official.  *Id.*

Besides the information concerning Mr. Murphy's name, address, telephone number, email address, the last four digits of his social security number, that he was a C-PROM candidate, and that he scored an 85, Ms. Kendrick did not know any other details concerning Mr. Murphy as of August 2013. DSMF ¶ 62; PRDSMF ¶ 62. She did not review any information regarding whether Mr. Murphy had a disability and did not know how old he was when she determined which candidates to select for interviews for the General Supply Specialist positions. DSMF ¶ 63; PRDSMF ¶ 63. She did not review Mr. Murphy's resume, nor did she review any other materials submitted by Mr. Murphy in connection with his application. *Id.* As of August 2013, Ms. Kendrick did not know whether Mr. Murphy had a disability, and she did not know Mr. Murphy's age. DSMF ¶ 64; PRDSMF ¶ 64.

Ms. Kendrick wrote "IRAT" beside Mr. Murphy's ranking information for the General Supply Specialist position at the GS-07 grade to indicate that he had scored below the cut-off. DSMF ¶ 65; PRDSMF ¶ 65. Mr. Murphy's IRAT rating was provided to him on August 22, 2013, by an email alert from the USA Staffing system, stating in part, "We have not reviewed your qualifications for this position because there are higher preference veterans and/or higher ranking candidates that must first be certified and considered." DSMF ¶ 66; PRDSMF ¶ 66.

### 4.   Mr. Murphy Is Not Selected for the GS-09 General Supply Specialist Position

The General Supply Specialist questionnaire contained a question regarding the applicants' minimum qualifications, which asked the applicants to select an answer which best described their highest level of education and/or experience they

possessed for the General Supply Specialist position.  DSMF ¶ 67; PRDSMF ¶ 67.

Mr. Murphy selected the following answer to the question regarding his minimum

qualifications:

> A – At the GS-07 level. I possess one (1) year of specialized experience
> that equipped me with the particular knowledge, skills, and abilities
> (KSAs) to successfully perform the duties of the position, and is directly
> in or related to this position. To be creditable, specialized experience
> must be at the GS-05 grade level or equivalent under other pay systems
> in the Federal service, military, or private sector. Examples of
> specialized experience are listed in the vacancy announcement.[46]

DSMF ¶ 68; PRDSMF ¶ 68.  This answer automatically disqualified Mr. Murphy for

the General Supply Specialist at the GS-09 grade, because he answered that he had

experience equivalent to the GS-07 level.  DSMF ¶ 69; PRDSMF ¶ 69.  Mr. Murphy's

name did not appear on a ranking list for the General Supply Specialist position at

the GS-09 grade.  DSMF ¶ 70; PRDSMF ¶ 70.  Ms. Kendrick did not review any of

Mr. Murphy's information with respect to his application for that grade.  DSMF ¶ 71;

PRDSMF ¶ 71.  Mr. Murphy was notified on August 22, 2013, by email alert from the

USA Staffing system that he rated "ID" for the General Supply Specialist GS-09

grade, stating, "You do not meet the minimum education and/or experience

requirements for this specialty and grade." DSMF ¶ 72; PRDSMF ¶ 72.  Mr. Murphy

was not selected to interview for the General Supply Specialist position at either the

GS-07 or GS-09 level and was informed of this on August 22, 2013.  DSMF ¶ 73;

PRDSMF ¶ 73.  The individuals ultimately selected for the General Supply Specialist

---

[46]   Mr. Murphy qualifies the statement to make clear that he did not understand the application.
PRDSMF ¶ 68.  The Court addresses the fact that Mr. Murphy did not understand the application in
footnote forty-four.

position at the GS-07 or GS-09 levels were not disabled and were younger than Mr. Murphy.  DSMF ¶ 74; PRDSMF ¶ 74.

 **F.** **Mr. Murphy Approaches the EEO**

  **1.** **The Reasonable Accommodation Process Generally**

 Reasonable accommodation requests are processed by the EEO.  PSAMF ¶ 139; DRPSAMF ¶ 139.  When a deaf employee requests a reasonable accommodation, the EEO's expectation is that an EEO Specialist will engage an interpreter to determine exactly what the employee is requesting.  PSAMF ¶ 140; DRPSAMF ¶ 140.  It is the employer's responsibility to discuss with the individual what the request is in order to provide the appropriate reasonable accommodation.  PSAMF ¶ 141; DRPSAMF ¶ 141.  A reasonable accommodation depends on the individual situation and the individual who is involved.  PSAMF ¶ 142; DRPSAMF ¶ 142.

 The parties agree that in order to provide an appropriate reasonable accommodation, it is important and helpful to know the reading level of a deaf employee.  PSAMF ¶ 143; DRPSAMF ¶ 143.  A reasonable accommodations request triggers an "interactive process" between the requesting individual and the management.  PSAMF ¶ 144; DRPSAMF ¶ 144.  An interactive process is one in which the EEO Specialist communicates with the employee and discusses the requested and necessary accommodations.  PSAMF ¶ 145; DRPSAMF ¶ 145.  The EEO Specialist will also involve all necessary parties and will sit in a meeting with the employee and their supervisor to facilitate the conversation if necessary.  *Id.*

DLA employees are educated about the reasonable accommodations process through policy statements posted throughout the building, which are written in English; there is no employee training. PSAMF ¶ 146; DRPSAMF ¶ 146. There are two methods of educating supervisors about the reasonable accommodation process, one through new supervisor orientation training and one through supervisory mandatory trainings. PSAMF ¶ 147; DRPSAMF ¶ 147. There was no training given to Mr. Murphy's supervisors, Mr. Fales and Mr. Dalfonso, about the reasonable accommodations policy or the reasonable accommodation request procedure. PSAMF ¶ 148; DRPSAMF ¶ 148. Ms. Shepheard cannot describe what constitutes an "interactive process." PSAMF ¶ 149; DRPSAMF ¶ 149. Ms. Shepheard required reasonable accommodation requests to be in writing. PSAMF ¶ 150; DRPSAMF ¶ 150. EEO Specialist Sheri Kelley testified that an employee does not have to use the words "reasonable accommodation" or even submit a written request to trigger the reasonable accommodations process; employees should also be able to make a reasonable accommodation request in ASL. PSAMF ¶ 151; DRPSAMF ¶ 151.

EEO Staffing Specialist Charlee Swingle testified that reasonable accommodations can be provided for the USA Staffing application process, where a Staffing Specialist helps the applicant manually fill out the application and upload the requisite documents. Alternatively, applications can also be accepted via fax if the applicant fills out the PDF version of the online application. PSAMF ¶ 152; DRPSAMF ¶ 152. Mr. Murphy's second-line supervisor, Mr. Fales, is the ultimate decision-maker for all of Mr. Murphy's reasonable accommodation requests, even if

Mr. Murphy first contacts the Program Disability Manager.   PSAMF ¶ 153; DRPSAMF ¶ 153.

### 2.   Mr. Murphy's Pre-2013 Contacts with the EEO

After years of attempting to get a promotion, Mr. Murphy contacted the EEO in 2005 during his employment with the Navy.  PSAMF ¶ 157; DRPSAMF ¶ 157.  In or about October 2005, Mr. Murphy contacted Terry Burk, an EEO Specialist at the Navy's Shipyard EEO Office, who said he would investigate his claim.  PSAMF ¶ 158; DRPSAMF ¶ 158.  Terry Burk summarized Mr. Murphy's complaint as follows:

> I'm being discriminated by Portsmouth Naval Shipyard, Code 500 Management and specifically Jonathan Green due to my disability (deaf) with the full support of his supervisor (George Stamos). I have the most experience and have the qualifications necessary, as evidenced by my being placed on the certificate of eligibles [sic] by HRSC-Northeast. I have not been selected for promotion although Jonathan Green has frequently promised that I would get the next promotion. My last promotion which was to WG-06 was effective on July 19, 2007. I believe that if I were not a deaf employee I would have been promoted by now.
>
> For Resolution…I seek to work in an environment that is free from this discriminatory behavior. I seek fair and equal treatment in regards to promotion opportunities, and that management promote me immediately.

PSAMF ¶ 159; DRPSAMF ¶ 159 (alteration in original).

Four months later, Mr. Murphy received an email, written in English, from Lorrie Oeser, EEO Manager of the Navy Shipyard, which stated:

> The EEO Office cannot take sides in an issue, but can try to help resolve issues . . . After talking to you and to management, it looks to me like the key here is for you to be viewed by management as the best candidate for promotions. The viewpoint right now is that you are not a top candidate. Part of the reason for this is because you are not seen as doing an excellent job in all aspects of your current job.

> Here's an idea that might help. Terry Burk can arrange for a job coach
> to come in on a daily basis to work with you on all tasks involved in your
> better understanding [sic] of what management says it is looking for.
> The state (Maine) vocational rehabilitation office offers this service, but
> we have to be prioritized on a waiting list.

PSAMF ¶ 160; DRPSAMF ¶ 160 (alterations in original). Mr. Murphy disagreed with Ms. Oeser's assessment that he was not the "best candidate" for promotion; rather, he has believed that he was not being promoted due to his disability. PSAMF ¶ 161; DRPSAMF ¶ 161. Mr. Dalfonso did not understand why a job coach was assigned to Mr. Murphy because Mr. Murphy knew how to do his job. PSAMF ¶ 162; DRPSAMF ¶ 162.

In 2006, Mr. Murphy complained to the Navy EEO again about not being promoted, resulting in a mediation. PSAMF ¶ 163; DRPSAMF ¶ 163. Ms. Shepheard attended the mediation. PSAMF ¶ 164; DRPSAMF ¶ 164. No remedy was offered during the mediation. PSAMF ¶ 165; DRPSAMF ¶ 165.

In April 2007, Mr. Murphy contacted the Navy EEO again when he was not selected for a promotion. PSAMF ¶ 166; DRPSAMF ¶ 166. Despite contacting the EEO, Mr. Murphy was still not provided with reasonable accommodations that would enable him to effectively navigate and apply for promotions through USA Staffing. PSAMF ¶ 162; DRPSAMF ¶ 162.

On November 18, 2010, following Mr. Murphy's transfer to the DLA, Mr. Murphy informed Mr. Fales that "he wanted to leave supply and get another job on the Shipyard." PSAMF ¶ 168; DRPSAMF ¶ 168. He also said that "he wanted to go to the EEO to get some help with getting another job." PSAMF ¶ 168; DRPSAMF ¶

168.  At a meeting on March 31, 2011, between Mr. Murphy, Mr. Fales, and Ms. Shepheard, Mr. Murphy communicated his desire to seek a promotion.[47]  PSAMF ¶ 169; DRPSAMF ¶ 169.  Mr. Murphy states that he received no assistance at this meeting.  *Id.*  However, Mr. Fales' contemporaneous notes summarizing the meeting suggest that they discussed Mr. Murphy "getting in touch with Shipyard EEO for help in placement" and that the supervisors offered Mr. Murphy points of contact at the DLA to assist him.  DRPSAMF ¶ 169; *Varga Decl.*, Ex. D, *Handwritten Mem.* at 5 (ECF No. 86-9).  In April 2011, Mr. Murphy contacted the Navy EEO and requested help in applying for a promotion; he was not given any help.[48]  PSAMF ¶ 170; DRPSAMF ¶ 170.  At this point, there was some confusion about whose responsibility it was to deal with Mr. Murphy's request due in part to the transfer from the Navy to the DLA.[49]  PSAMF ¶ 174; DRPSAMF ¶ 174.

---

[47]    Mr. Murphy states that he "was not given assistance" at the meeting.  PSAMF ¶ 169.  The Secretary seeks to qualify the statement, arguing that Mr. Fales contemporaneous notes from the meeting suggests that Mr. Murphy's supervisors did offer him assistance.  DRPSAMF ¶ 169.  *Varga Decl.*, Ex. D, *Handwritten Mem.* at 5 (ECF No. 86-9).  The memorandum reflects that Mr. Murphy's supervisors did offer assistance during the meeting.  *Id.* at 5.  The Court adjusts the proposed statement to provide that although Mr. Murphy states that he received no assistance, Mr. Fales' contemporaneous notes suggest otherwise.

[48]    Mr. Murphy also proposes: "Mr. Murphy went to the Shipyard EEO in 2012; he was told that the Shipyard EEO could not help him."  PSAMF ¶ 171 (citing *Murphy Interrogs. I* at 10).  The Secretary qualifies the statement to explain that Mr. Murphy likely intended to cite page sixteen of his interrogatory and that Mr. Murphy is referring to an incident that occurred in 2013, not 2012.  DRPSAMF ¶ 171 (citing *Murphy Interrogs. I* at 16).  Upon review of the record, the Court agrees with the Secretary's qualification.  The Court discusses the 2013 incident in following sub-section.

[49]    Mr. Murphy states that when he "requested a reasonable accommodation to help him with the promotion process, DLA management did not know whose responsibility it was to process this request."  PSAMF ¶ 174.  The Secretary denies the statement as unsupported by the record, arguing that the DLA witnesses were never questioned about whose responsibility it was to process reasonable accommodations requests.  DRPSAMF ¶ 174.

Mr. Murphy's statement provides no time frame.  The record indicates that there was some confusion shortly after the transition from the Navy to the DLA regarding which agency was responsible for a reasonable accommodation request that Mr. Murphy made in 2011.  *See Gambrell Dep.* at 166:2–10; *Shepheard Dep.* at 80:3–17.  However, there is no testimony that this confusion persisted into 2013, when Mr. Murphy approached the EEO about not being promoted for the General

### 3.  Mr. Murphy Approaches the EEO After He Was Not Hired for the General Supply Specialist Positions

On August 23, 2013, a day after learning that he was not hired for the General Supply Specialist position at either the GS-07 or GS-09 level, Mr. Murphy went to a Navy EEO Specialist at the Portsmouth Naval Shipyard named Ava Drost to make a complaint about not being hired due to his age—Mr. Murphy was 69 years old at the time—and his disability.[50]  DSMF ¶¶ 75, 79; PRDSMF ¶¶ 75, 79; PSAMF ¶ 175; DRPSAMF ¶ 175.  Mr. Murphy arrived at the Navy EEO office as a walk-in on August 23, 2013, without an appointment or notifying the Navy EEO beforehand, and

---

Supply Specialist positions.  The Court adjusts the statement to reflect that shortly after the transition to the DLA in 2011, there was some confusion about who was responsible for processing Mr. Murphy's reasonable accommodation requests.

[50]     Mr. Murphy qualifies the statement: "[Mr.] Murphy's communications with Ms. Drost on August 23, 2013, were to complain about discrimination he suffered from in the workplace; his inability to receive a promotion due to discrimination on the basis of his profound deafness and age; and DLA's failure to provide him with reasonable accommodations through the promotion process, considering him not being literate in English."  PRDMSF ¶¶ 75, 79 (citing *Murphy Interrogs. I* at 8; *Murphy Dep. Aug. 2015* at 14:8–11, 44:7–9; *Decl. of Ava Drost* ¶ 3 (ECF No. 66) (*Drost Decl.*).

The Court notes that the Secretary copied his proposed statement nearly verbatim from Mr. Murphy's Second Amended Complaint.  *Second Am. Compl.* ¶ 38.  Moreover, the record citations that Mr. Murphy provides to substantiate his qualification do not support any facts beyond those found in the Secretary's proposed statement.  Mr. Murphy's interrogatory responses simply state that Mr. Murphy "went back to the EEO Office at the Shipyard after [he] was once again passed over for a promotion" and that the Navy EEO Specialist informed him that he needed to communicate with the DLA EEO officer in Ohio.  *Murphy Interrogs. I* at 8.  Similarly, Mr. Murphy's deposition testimony reveals that he went to the EEO office at the Shipyard and was informed that he needed to contact the office in Ohio.  *Murphy Dep. Aug. 2015* at 14:8–11, 44:7–9.  Finally, the declaration of Ava Drost only states that Mr. Murphy went to the Navy EEO office on August 23, 2013, and brought with him printed notifications that he had not been selected for a DLA job opening.  None of these citations indicates that Mr. Murphy communicated with Ms. Drost at the Shipyard EEO office on August 23, 2013, for any other reason than to complain about not being hired for the General Supply Specialist positions on account of his age and disability.

In sum, the record reflects that Mr. Murphy spoke with Ms. Drost "to complain that [he] was not getting promoted or offered new jobs because of [his] disability and age."  *Stip.*, Attach. 3, *Formal Compl. of Discrimination in the Fed. Gov't* at 6 (ECF No. 60) (*Formal EEO Compl.*).  This is precisely what appears in the Secretary's proposed statement and Mr. Murphy's own Second Amended Complaint.  Accordingly, the Court rejects the qualification.

therefore an ASL interpreter was not present.[51,52]   DSMF ¶ 76; PRDSMF ¶ 76.

Although an ASL interpreter was not present, Mr. Murphy brought with him printed

notifications that he had not been selected for the DLA job opening.   DSMF ¶ 77;

PRDSMF ¶ 77.

Ms. Drost did not discuss Mr. Murphy's complaint with him; rather, in a

handwritten note, Ms. Drost wrote, "Unfortunately, we don't service DLA.   I can't

---

[51]     Mr. Murphy seeks to qualify the statement to explain that he "was not aware that he could have requested an interpreter."  PRDSMF ¶ 76 (citing *Murphy Dep. June 2015* at 26:12–16, 18–19). Mr. Murphy's record citation does not support the qualification.   The cited portion of Mr. Murphy's June 2015 deposition reads:

> Q:     Prior to seeing the EEO specialist, you could have called and scheduled an appointment with an interpreter to attend with you, couldn't you?
> A:     No, I can't.  I couldn't have.
> Q:     Why could you not have scheduled an appointment with the aid of an interpreter before seeing the EEO specialist?
> A:     Well, I can't call.  I'm deaf.  How could I call?

*Murphy Dep. June 2015* at 26:12–19.  This passage does not reflect that Mr. Murphy was unaware that he could request an interpreter.   Rather, his testimony merely indicates that he could not effectively make a call for an interpreter because of his deafness.  *See also* PSAMF ¶ 176; DRPSAMF ¶ 176.  By contrast, earlier in Mr. Murphy's deposition, his testimony suggests that he did know that he could request an interpreter:

> Q:     You have an official work e-mail account in connection with your employment by the DLA, correct?
> A:     It's used for safety and for training, that e-mail.
> Q:     What about requests for interpreters?
> A:     Sometimes I use e-mail when I need an interpreter.  Sometimes people talk to me at work and I don't know what they're saying.
> Q:     Do you use your work e-mail to request interpreters?
> A:     Not all the time.  Maybe about half the time.

*Murphy Dep. June 2015* at 13:1–12.  Because the record citation does not support the statement that Mr. Murphy "was not aware that he could have requested an interpreter," the Court rejects the qualification.

[52]     Mr. Murphy proposes: "Mr. Murphy could not have emailed to make an appointment either, because he does not read or write in English and he is not knowledgeable with computers."  PSAMF ¶ 177.  The Secretary denies the statement.  DRPSAMF ¶ 177.  Mr. Murphy's statement contradicts his June 2015 deposition testimony.  *See Murphy Dep. June 2015* at 13:10–12 ("Q: Do you use your work e-mail to request interpreters?  A: Not all the time.  Maybe about half the time").  For this reason, and for the reasons set forth in footnotes three and twenty-two, the Court omits the proposed statement.

step in."[53]  DSMF ¶ 78; PRDSMF ¶ 78; PSAMF ¶ 171; DRPSAMF ¶ 171.  She provided

him with a print-out of the DLA EEO contacts in Columbus, Ohio, but she took no

other steps to ensure Mr. Murphy's understanding.  *Id.*; PSAMF ¶ 178; DRPSAMF ¶

178.

   Mr. Murphy did not fully understand his meeting with Ms. Drost and

complained to his department supervisor, who then directed him to speak with his

immediate supervisor.[54]  PSAMF ¶ 182; DRPSAMF ¶ 182.  His immediate supervisor

contacted Ms. Shephard, who then communicated with Mr. Gambrell, the Disability

Program Manager of the EEO for the DLA Land and Maritime, on August 23, 2013.

*Id.*; PSAMF ¶ 172; DRPSAMF ¶ 172.  In her email to Mr. Gambrell, Ms. Shepheard

wrote:

> I have a deaf employee who is having issues qualify [sic] for jobs, I
> believe he's having problems completing his resume.  Is there assistance
> available for this gentleman, he's currently a WG-06 Warehouse worker
> and is not that familiar with computers etc.
>
> He's brought his status paperwork for a GS-07 Supply Tech register
> which says "you do not meet the minimum education and/or experience
> requirements for this specialty and grade" and has asked me for
> assistance.

[53]   Mr. Murphy qualifies the Secretary's statement to explain that Ms. Drost did not discuss Mr. Murphy's complaint with him, and that "no steps were taken to ensure Mr. Murphy's understanding." PRDSMF ¶ 78 (citing *Drost Decl.*, Attach. 1, *Handwritten Note* at 1 (ECF No. 66); *Decl. of Abigail C. Varga, Esq.*, Ex. A, *Feb. 21, 2014 Email* at 1 (ECF No. 80)).  Viewing the facts in the light most favorable to Mr. Murphy, the record supports the qualification.  The Court amends the statement to include an excerpt from Ms. Drost's handwritten note and to reflect that Ms. Drost took no further steps to ensure Mr. Murphy's understanding.

[54]   Mr. Murphy proposes, in part: "Mr. Murphy complained to his department supervisor that he had been unable to make an EEO complaint."  PSAMF ¶ 182.  The Secretary qualifies the statement, arguing that Mr. Murphy's record citations do not support the claim that Mr. Murphy complained "that he had been unable to make an EEO complaint."  DRPSAMF ¶ 182.  The record reflects that Mr. Murphy went to the Shipyard EEO and spoke with Ms. Drost without an interpreter, but that she was unable to help him.  *Murphy Interrogs. I* at 8.  Mr. Murphy "did not fully understand" his meeting with Ms. Drost and complained to his supervisors.  *Id.*  The Court amends the statement to reflect that Mr. Murphy did not fully understand his meeting with Ms. Drost.

*Dep. of Sheri Kelley*, Attach. 4, *Emails Re: Murphy Resume* at 9 (ECF No 76).   On August 23, 2013, Mr. Gambrell sent Ms. Shepheard an email and requested that Mr. Murphy send him a copy of his resume.   PSAMF ¶ 185; DRPSAMF ¶ 186.   Ms. Shepheard does not remember Mr. Murphy ever asking for help with his resume. PSAMF ¶ 186; DRPSAMF ¶ 186.   Ms. Shepheard did not follow up with Mr. Gambrell or Mr. Murphy regarding the August 2013 emails.   PSAMF ¶ 188; DRPSAMF ¶ 188.

Neither Mr. Gambrell nor Ms. Shepheard viewed Mr. Murphy's request for help with the application and promotion process as a reasonable accommodation request.   PSAMF ¶ 184; DRPSAMF ¶ 184.   Rather, Mr. Gambrell viewed this as a "request for assistance."   PSAMF ¶ 184; DRPSAMF ¶ 184.   Mr. Gambrell does not like to "get involved in a tightrope of this is or isn't an actual reasonable accommodations request," despite the fact that his job is to oversee reasonable request accommodation requests.   *Id.*

After emailing Mr. Gambrell his resume the first time and hearing no reply, Mr. Murphy sent Mr. Gambrell his resume again on October 24, 2013.   PSAMF ¶ 189; DRPSAMF ¶ 189.   On Mr. Murphy's resume, it states: "Language Skills: Language Spoken Written Read, American Sign Language Advanced Advanced Advanced"; English was not listed.   PSAMF ¶ 190; DRPSAMF ¶ 190.   On November 4, 2013, Mr. Gambrell provided Mr. Murphy with instructions—written in English—on how to improve his resume.[55]   PSAMF ¶ 191; DRPSAMF ¶ 191.   Mr. Murphy understood

---

[55]      In his proposed statement, Mr. Murphy says that Mr. Gambrell provided him with suggestions on his resume "instead of initiating the complaint Mr. Murphy had requested."   PSAMF ¶ 191.   The Secretary qualifies the statement, arguing that Mr. Murphy "has provided no citation to the record showing he requested anyone at the DLA to 'initiate a complaint.'"   DRPSAMF ¶ 191.

that the email had something to do about his resume, but he did not fully understand Mr. Gambrell's email. PSAMF ¶ 192; DRPSAMF ¶ 192.  Mr. Murphy was not seeking job or resume counseling from the EEO; rather, he wanted to file a complaint due to discrimination based on his disability and age, and the resultant inability to obtain a new job, a raise, or a promotion. PSAMF ¶ 194; DRPSAMF ¶ 194.   Mr. Murphy was upset with the little help he received from Mr. Gambrell and that Mr. Gambrell did not offer to help him file a complaint.[56]  PSAMF ¶ 193; DRPSAMF ¶ 193.

Mr. Gambrell believed sending Mr. Murphy an email and making edits to his resume—without any follow-up—constituted an "interactive process." PSAMF ¶ 195; DRPSAMF ¶ 195.  For Mr. Murphy's request, Mr. Gambrell did not "go through an actual reasonable accommodation analysis and determination."  PSAMF ¶ 197 (quoting *Dep. of Paul Gambrell* at 136:3–5 (ECF No. 78) (*Gambrell Dep.*)); DRPSAMF

---

Although Mr. Murphy cites his first set of interrogatory responses, the Secretary is correct that this is likely an error and that he intended to cite to his second set of interrogatory responses. *See Murphy Interrogs. II* at 9–10.  In his responses to the second set of interrogatories, Mr. Murphy states that he "was eventually connected with the DLA EEO office where, *instead of initiating a complaint as I had requested*, I was provided with instructions, written in English, to improve my resume." *Murphy Interrogs. at 10* (emphasis added). However, the Secretary points out that in his deposition, Mr. Murphy testified that he did not request Mr. Gambrell's help in filing a complaint. DRPSAMF ¶ 11 (citing *Murphy Dep. June 2015* at 37:5–38:13).

In his deposition, Mr. Murphy made clear that he did not raise the issue of filing a complaint with Mr. Gambrell. *Murphy Dep. June 2015* at 37:5–8; 38:12–16.  In fact, he explained that he did not ask Mr. Gambrell for help to file a complaint because "I felt like that was too much—drawing too much attention to the situation.  I felt this was a confidential matter and that it was more an issue for my immediate supervisor, for my manager." *Id.* at 40:4–8.  Where there is a conflict between an affidavit and a deposition, without any explanation, the deposition controls.  *See Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4–5 (1st Cir. 1994).  The Court therefore adjusts the statement to clarify that Mr. Murphy did not request that Mr. Gambrell help him initiate a complaint.

[56]   Mr. Murphy proposes the following: "Mr. Murphy was upset with the little help he received from Paul Gambrell: 'He didn't help me file.  I needed help to file, but he didn't offer.  He didn't provide me with the help to file my complaint.  He didn't do any.'" PSAMF ¶ 193.  The Secretary incorporates his qualification of PSAMF ¶ 191 to clarify that Mr. Murphy did not ask Mr. Gambrell to help him file a complaint. DRPSAMF ¶ 193.  For the reasons set forth in the preceding footnote, the Court amends the statement to reflect that Mr. Murphy was upset with the little help he received from Mr. Gambrell and that Mr. Gambrell did not offer to help file a complaint.

¶ 197. Although it is Mr. Gambrell's policy to follow-up with an employee after receiving information from the employee's supervisor about a reasonable accommodation request, Mr. Gambrell did not contact Mr. Murphy when he received an accommodation request from Ms. Shepheard and instead relied solely on the information that was provided to him. PSAMF ¶ 198; DRPSAMF ¶ 198. Mr. Gambrell never communicated with Mr. Murphy through an interpreter during the process to determine the root of Mr. Murphy's concerns. PSAMF ¶ 196; DRPSAMF ¶ 196. Mr. Gambrell believed that Mr. Murphy's difficulty with computers was more of an information technology issue than a language barrier. PSAMF ¶ 199; DRPSAMF ¶ 199. According to Mr. Gambrell, if he had known that Mr. Murphy was not able to answer the questions on the USA Staffing site and was not able to understand the language, then Mr. Gambrell would have told him, "[L]et's get an interpreter in here to help you understand the questions so you can respond appropriately." PSAMF ¶ 200; DRPSAMF ¶ 200.

Ms. Shepheard's August 23, 2013 email informed Mr. Gambrell that Mr. Murphy was "not that familiar with computers." PSAMF ¶ 35; DRPSAMF ¶ 35. Mr. Gambrell also received an email from Ms. Shepheard on December 19, 2013, stating that Mr. Murphy's English is very limited, and that he "really relies on signing." PSAMF ¶ 36; DRPSAMF ¶ 36. Additionally, Mr. Gambrell received emails from Ms. Oeser stating that Mr. Murphy "does not use emails." PSAMF ¶ 34; DRPSAMF ¶ 34. Nevertheless, Mr. Gambrell used email to communicate with Mr. Murphy "[b]ased on

the fact that Mr. Murphy provided [him] emails and responded to [his] emails."[57] PSAMF ¶ 37; DRPSAMF ¶ 37.   According to Mr. Gambrell, this "indicated to [him] at the time that he was capable of corresponding back and forth using emails in the computer."  *Id.*  Paul Gambrell stated that even if he learned that a co-worker edited Mr. Murphy's emails, this "in and of itself would not change" his assessment of Mr. Murphy's abilities to communication in English.[58]  PSAMF ¶ 38; DRPSAMF ¶ 38.

By at least November 21, 2013, DLA EEO contacts were aware that Mr. Murphy felt that his management and the servicing EEO office were unresponsive to his request for accommodations.  PSAMF ¶ 202; DRPSAMF ¶ 202.[59,60] In particular,

---

[57]    In PSAMF ¶ 37, Mr. Murphy states, "Despite these notification emails, Paul Gambrell continuously emailed Mr. Murphy, still believes that Mr. Murphy can read and comprehend written English language, and was not concerned about Mr. Murphy's comprehension with his emails." PSAMF ¶ 37.  The Secretary interposes a qualification "to the extent that [the statement] accurately reflects the cited deposition transcript of Paul Gambrell in a non-argumentative manner."  DRPSAMF ¶ 37.

In his deposition, Paul Gambrell acknowledges that he knew that Mr. Murphy was deaf, but stated that his concern about Mr. Murphy's ability to comprehend his emails "was addressed when he was corresponding back and forth."  *Gambrell Dep.* at 200:22–201:23; *see also Gambrell Dep.* at 52:12–19; 80:2–81:1; 200:6–13.  The Court concludes that Mr. Murphy's statement is misleading without this added context.  Thus, the Court amends the statement to include direct testimony from Mr. Gambrell regarding his reason for emailing with Mr. Murphy.

[58]    Mr. Murphy proposes: "Paul Gambrell stated that, even if he had known Mr. Murphy did not compose his emails, Mr. Gambrell's assessment regarding Mr. Murphy's ability to communicate through written English would not change."  PSAMF ¶ 38.  The Secretary interposes the same qualification described in footnote fifty-seven.  For the reasons set forth in that footnote, the Court amends the statement to more accurately reflect Mr. Gambrell's testimony.  *See Gambrell Dep.* at 58:6–16.

[59]    In his proposed statement, Mr. Murphy asserts that the "DLA EEO contacts were aware that Mr. Murphy felt his management and servicing EEO were unresponsive to his request for accommodations *and for help in filing the EEO complaint.*"  PSAMF ¶ 202.  The Secretary seeks to qualify the statement, arguing that the cited record makes no reference to Mr. Murphy asking the EEO for help to file a complaint.  DRPSAMF ¶ 202.  For the reasons set forth in footnote fifty-five, the Court removes Mr. Murphy's reference to requesting help to file a complaint from the EEO.

[60]    Mr. Murphy proposes: "Paul Gambrell admitted that there was an overall 'lack of responsiveness.'"  PSAMF ¶ 203.  Mr. Murphy's assertion mischaracterizes Mr. Gambrell's testimony.  Rather than admitting an overall lack of responsiveness, Mr. Gambrell mention of "a lack of responsiveness" relates to an email he received from his colleague, Ms. Oeser, summarizing the concerns of the deaf employee affinity group.  *Gambrell Dep.* at 217:20–218:3; *see also Kelley Dep.*, Attach. 2, *Email Re: Deaf Employee Concerns* (ECF No. 76).  The Court omits the statement.

on November 21, 2013, Ms. Kelley, a DLA EEO Specialist, attended a teleconference with Ms. Oeser to discuss concerns that Mr. Murphy raised at a Deaf Affinity Group meeting, including his inability to get a promotion and his confusion regarding which EEO office serviced him. *Dep. of Sheri Kelley*, Attach. 1, *Memo for Record* at 1 (ECF No. 76) (*Memo for Record*). Following the teleconference, Ms. Kelley wrote to Mr. Gambrell and Ms. Oeser, "Tasks I have taken on: 1. Make sure DLA management at your site is fully aware of how to contact us, EEO and all employees there know how to request reasonable accommodations." PSAMF ¶ 201; DRPSAMF ¶ 201.

On December 10, 2013, Ms. Kelley met with Mr. Murphy, Mr. Dalfonso, and Mr. Fales, and an ASL interpreter via video conference. PSAMF ¶ 179; DRPSAMF ¶ 179; *Memo for Record* at 1. She informed Mr. Murphy that the EEO that serviced DLA employees was located in Columbus, Ohio, and provided him with contact information. PSAMF ¶ 179; DRPSAMF ¶ 179; *Memo for Record* at 1. She also explained to Mr. Murphy how to request an interpreter. PSAMF ¶ 33; DRPSAMF ¶ 33. Additionally, she informed Mr. Murphy that the Shipyard was planning to conduct a second USA Staffing training event and that if it did not take place, she would personally arrange a training session for him. *Memo for Record* at 1–2. Mr. Murphy could not understand the ASL interpreter because the video teleconference kept freezing. PSAMF ¶ 180; DRPSAMF ¶ 180. Following the video teleconference, Mr. Murphy still did not know how to contact the DLA EEO.[61]   PSAMF ¶ 181; DRPSAMF ¶ 181.

---

[61]   The Secretary denies the statement as unsupported by the record citation because Dr. Spitz's testimony does not concern the EEO office of the DLA. DRPSAMF ¶ 181. Dr. Spitz testified, "I did

Although she was aware of Mr. Murphy's limited English language ability and that he was "not that familiar with computers," Ms. Kelley sent Mr. Murphy an email, written in English, following the video conference to inform him that he could contact her at any time if he needed anything or was not comfortable.[62]  PSAMF ¶¶ 31–33, 35; DRPSAMF ¶ 31–33, 35.  She received no indication that he did not understand her email.  PSAMF ¶ 32; DRPSAMF ¶ 32.  However, on December 19, 2013, she received an email from Ms. Shepheard reiterating that Mr. Murphy's English is very limited, and that he "really relies on signing."  PSAMF ¶ 36; DRPSAMF ¶ 36.

On December 19, 2013, Mr. Murphy requested training for the USA Staffing application process from the DLA EEO through Ms. Shepheard.  PSAMF ¶ 204; DRPSAMF ¶ 204.  Ms. Shepheard contacted Mr. Gambrell about the reasonable accommodation, who provided broad, "high level" responses with virtually no specific reference to Mr. Murphy's individual situation.  PSAMF ¶ 187; DRPSAMF ¶ 187.  Ms. Kelley, who was responsible for responding to accommodation requests at the time,

---

ask him . . . did you communicate with DLA?  And . . . his response was he didn't know how to contact them."  *Spitz Dep.* 94:22–25.  Although this excerpt does not specify whether Dr. Spitz was referring to the DLA EEO office, her testimony directly afterward clarifies that she was referring to the EEO office of the DLA.  *See id.* 95:1–3.  The Court includes the proposed statement over the Secretary's denial.

[62]   Mr. Murphy proposes, "Instead of determining whether he could communicate via written English or via email, Sheri Kelley assumed Mr. Murphy could read her emails by relying on the fact that he never expressed to her, through email, that he did not understand her emails."  PSAMF ¶ 32.  Likewise, Mr. Murphy states, "[Ms. Kelley] did not know whether Mr. Murphy could understand the emails she sent him."  PSAMF ¶ 31.  The Secretary seeks to qualify both statements, arguing that although Ms. Kelley was aware of Mr. Murphy's limited English skills, she "had no indication that [Mr. Murphy] had not understood certain emails she had sent him."  DRPSAMF ¶¶ 31–32.

It is undisputed that Ms. Kelley sent Mr. Murphy an email following the video conference despite knowing that he had limited English skills.  From this, Mr. Murphy asserts that "Sheri Kelley assumed Mr. Murphy could read her emails."  PSAMF ¶ 32.  However, the record only states that Ms. Kelley "receiv[ed] nothing…stating he was not understanding" her emails.  The Court adjusts the statement to hue as closely as possible to the record.

never followed up with Mr. Murphy about USA Staffing training, despite telling Mr. Murphy previously that she would personally set up a USA Staffing training with Mr. Murphy and an interpreter if he ever requested it.  PSAMF ¶ 205; DRPSAMF ¶ 205.  The only person who agreed to help Mr. Murphy translate the application questionnaire was his friend and co-worker, Ms. Knowles.  PSAMF ¶ 206; DRPSAMF ¶ 206.  Ms. Knowles is not a supervisor, not a member of DLA management, and is not an ASL interpreter.  PSAMF ¶ 206; DRPSAMF ¶ 206.

In total, Mr. Murphy complained to Mr. Fales, Ms. Shepheard, Mr. Dalfonso, Ms. Oeser, and Ms. Kelley fifteen times in 2013 that he was still not getting promoted due to his deafness and requested assistance with getting a promotion and the USA Staffing website.  PSAMF ¶ 173; DRPSAMF 173.

## G.   Mr. Murphy Files a Formal Complaint

Mr. Murphy filed his formal EEO complaint of discrimination with the DLA EEO office on February 7, 2014, which was then provided to the DLA Land and Maritime Office of Equal Employment Opportunity & Diversity for investigation on February 13, 2014.[63]  DSMF ¶ 80; PRDSMF ¶ 80.  Mr. Murphy received little help

---

[63]     In PSAMF ¶ 207, Mr. Murphy states that he "received little help with filing a complaint, even though he asked for assistance with the EEO process."  PSAMF ¶ 207.  The Secretary denies the statement, arguing Mr. Murphy provides no record evidence that Mr. Murphy asked for help filing a complaint.  PSAMF ¶ 207 (incorporating PSAMF ¶¶ 191, 202).

        In support of his statement, Mr. Murphy cites the stipulated record, a set of handwritten notes from Mr. Fales, and the deposition of an expert witness, Dr. Romy Spitz.  The stipulated record simply acknowledges that Mr. Murphy filed a complaint.  *See Stip.*¶ 8.  Mr. Fales' handwritten notes relate to two meetings in 2010 and 2011 in which Mr. Murphy stated that he wanted to contact the EEO about getting placed in another position.  The notes state that Mr. Fales offered points of contact from the DLA to assist him.  *Memo for Record* at 5.  These 2010 and 2011 notes do not relate to Mr. Murphy's 2014 filing of the complaint.  Finally, Dr. Spitz testified that "[b]oth in the materials for discovery and in [Mr. Murphy's] deposition it says that he asked for assistance with the EEO process[.]"  *Spitz Dep.* at 48:13–16.  Curiously, Mr. Murphy does not cite the materials that Dr. Spitz refers to in her deposition.  The Court is unwilling to rely on Dr. Spitz interpretation of the record in lieu of actual

with filing a complaint. PSAMF ¶ 207; DRPSAMF ¶ 207. The formal EEO complaint of discrimination indicated that Mr. Murphy had discussed his complaint with Navy EEO Specialist Ms. Drost—and had first asked to see an EEO counselor—in August 2013.[64] DSMF ¶ 81; PRDSMF ¶ 81. However, Mr. Murphy sought assistance from an EEO counselor at least nine times before August 2013. PRDSMF ¶ 81.

The formal EEO complaint of discrimination detailed the alleged discrimination and adverse employment actions to which Mr. Murphy believed he had been subjected. DSMF ¶ 82; PRDSMF ¶ 82. Specifically, besides his failure to accommodate claim, Mr. Murphy asserted "Loss of Opportunity/Failure to Promote" and "Unequal Pay" as the illegal employment discrimination adversely affecting his employment.[65] DSMF ¶ 83; PRDSMF ¶ 83. Regarding his asserted "Loss of Opportunity/Failure to Promote," Mr. Murphy stated that despite his numerous efforts to obtain a promotion over the years, he had never been given one, with the most recent example being his application for the position of General Supply

---

record citations. Accordingly, the Court omits the portion of the statement that says that Mr. Murphy "asked for assistance with the EEO process."

[64] Mr. Murphy denies the statement, arguing that although he asked to see an EEO counselor in August 2013, this was not the first time he had asked to see an EEO counselor. PRDSMF ¶ 81. The Secretary's statement relates to the information contained in Mr. Murphy's formal EEO complaint, the one he filed on February 7, 2014. The Secretary is correct that in the formal complaint, Mr. Murphy indicated that the date he first asked to see an EEO counselor was August 2013. *Formal EEO Compl.* at 3. However, the record also reflects that Mr. Murphy asked to see an EEO counselor at least nine times before August 2013. *Murphy Interrogs. II* at 3–4. Therefore, the Court construes Mr. Murphy's denial as a qualification and amends the statement accordingly.

[65] Mr. Murphy qualifies the Secretary's statement to clarify that "Mr. Murphy's discrimination includes more than the loss of opportunity, the failure to promote, and 'unequal pay.'" PRDSMF ¶ 83. The Secretary's statement refers only to the formal EEO complaint that Mr. Murphy filed in February 2014, and the Secretary accurately sets forth the allegations of discrimination contained in that complaint. Because Mr. Murphy's qualification is beyond the scope of the Secretary's statement, and because Mr. Murphy's other allegations of discrimination are discussed in detail elsewhere, the Court rejects the qualification.

Specialist at the GS-07 and GS-09 levels in August 2013.  DSMF ¶ 84; PRDSMF ¶

84.  Regarding his asserted "Unequal Pay," Mr. Murphy stated that "[f]or years and

even now, I have been doing the same work that co-workers do and they are paid

more."  DSMF ¶ 85; PRDSMF ¶ 85.

As part of the subsequent EEO investigation, Mr. Murphy was asked clarifying

questions about his claims.[66]  PSAMF ¶ 209; DRPSAMF ¶ 209.  Specifically, Mr.

Murphy's EEO Declaration contains the following question and response:

3.    During the period at issue (August 22, 2013), what was your
      position, series, grade, and geographical location?

A.    Actually, August 22, 2013 is not the period at issue necessarily.
      This complaint has been filed because I have never been promoted
      or given any other opportunities over the decades I have been here
      and I have been stuck in the same position and WG 6 since about
      1985 while my peers and co-workers have moved on to better
      situations.

---

[66]    In PSAMF ¶ 209, Mr. Murphy proposes:

As part of the subsequent EEO investigation, Mr. Murphy was asked clarifying
questions about his claims.  In response, Mr. Murphy specifically noted and disclaimed
that the two issues identified by the EEO as his claims did not encompass the full scope
of his claims, and asserted that he believed he had been discriminated against for years
by never receiving a promotion because of his disability, and was brushed aside when
he requested help in navigating the application system, or simply even in his
communication in general with his supervisors.

PSAMF ¶ 209 (citing *Murphy EEO Decl.* at 2).
        The Secretary denies the statement.  DRPSAMF ¶ 209.  The Secretary argues that Mr.
Murphy's statement in his EEO Declaration did not provide the DLA investigators with any more
details of actionable discrimination beyond what Mr. Murphy previously identified in his EEO
complaint.  *Id.*  Additionally, the Secretary contends that Mr. Murphy's proposed statement is
misleading because it "omits the entirety of the DLA's EEO correspondence and investigation with
[Mr. Murphy] and his counsel, during which [Mr. Murphy] was asked repeatedly to clarify his claims,
failed to offer any such clarification, and to the contrary, affirmatively accepted the DLA's scope of his
claims."  *Id.*
        The Court will address this issue more fully in its discussion.  For purposes of the summary
judgment facts, the Court prefers to track the record evidence as closely as possible.  As such, the
Court will amend the statement to include the full text of the relevant question and answer in the
EEO Declaration.

*Id.*; *Redacted Document*, Attach. 1, *Decl. Under Penalty of Perjury* at 2 (ECF No. 104) (*Murphy EEO Decl.*).

On December 11, 2014, Plaintiff received the final agency decision by the DLA on his formal EEO complaint.  DSMF ¶ 86; PRDSMF ¶ 86.  The decision focused on the August 22, 2013 failure to promote and characterized Mr. Murphy's failure to accommodate claim as a request to create a "deaf friendly culture."  PSAMF ¶ 210; DRPSAMF ¶ 210.  The decision did not address the allegations that the Secretary had failed to promote Mr. Murphy "over the decades" as a result of his disability.  *Id.* (quoting *Murphy EEO Decl.* at 2).

## III.   THE PARTIES' POSITIONS

### A.   Mr. Murphy's Second Amended Complaint

Mr. Murphy asserts the following claims:

#### 1.   Count I: Failure to Promote on the Basis of Disability

In Count I of Mr. Murphy's Second Amended Complaint, Mr. Murphy alleges that the Secretary breached his legal obligations under the Rehabilitation Act, 29 U.S.C. § 791 *et seq.*, by denying Mr. Murphy employment opportunities due to his deafness.  *Second Am. Compl.* ¶¶ 47–55.  Mr. Murphy asserts that despite being qualified and able to perform the essential duties of the available positions, he was passed over for employment in favor of less qualified, non-disabled candidates.  *Id.* ¶ 50.

#### 2.   Count II: Failure to Accommodate

53

In Count II, Mr. Murphy alleges that the Secretary failed to make reasonable accommodations for his disability in violation of the Rehabilitation Act and that the Secretary failed to engage in a good faith, interactive process with Mr. Murphy concerning his need for accommodations. *Id.* ¶¶ 56–65. Further, Mr. Murphy asserts that the Secretary did not select Mr. Murphy for the General Supply Specialist position or other positions due in part to a fear that Mr. Murphy would require continuing job accommodations. *Id.* ¶¶ 62–63.

### 3.     Count III: Failure to Promote on the Basis of Age

In Count III, Mr. Murphy alleges that the Secretary intentionally and willfully denied Mr. Murphy a promotion to the General Supply Specialist positions and other positions due in part to his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* *Id.* ¶¶ 66–75.

## B.     The Secretary's Motion for Partial Summary Judgment: The Parties' Positions

The Secretary moves for judgment as a matter of law that Mr. Murphy's action is limited to events that occurred forty-five days prior to his contact with an EEO counselor on August 23, 2013, in accordance with the timing and administrative exhaustion requirements of the Rehabilitation Act and the ADEA. *Def.'s Mot.* at 11–13. The Secretary contends that the only allegedly discriminatory conduct that falls within this forty-five day lookback period is the DLA's decision not to promote Mr. Murphy to the General Supply Specialist positions in August 2013. *Id.* at 14–15. Because the DLA Human Resources Specialist who rejected Mr. Murphy for the General Supply Specialist positions was unaware of his deafness or his age at the

54

time she reviewed his application, the Secretary maintains that the Court should further enter summary judgment in the Secretary's favor on Counts I and III.  *Id.* at 17–20.  This would leave only Count II—Mr. Murphy's failure to accommodate claim—for trial.

In response, Mr. Murphy argues that the Court should not limit his lawsuit to events that occurred forty-five days prior to his contact with an EEO counselor on August 23, 2013.  *Pl.'s Opp'n* at 7–15.  He contends that the forty-five day limitation, although mandatory, is not jurisdictional, and therefore is subject to equitable limitations such as waiver, estoppel, and equitable tolling.  *Id.* at 8 (citing *Mercado v. Ritz Carlton San Juan Hotel, Spa & Casino*, 410 F.3d 41, 50 n.6 (1st Cir. 2005)).  In this case, Mr. Murphy argues that the Secretary waived his argument that Mr. Murphy's claims are time barred and that the Court should equitably toll the limitations period to encompass claims outside the forty-five day window.  *Id.* at 8–15.

Mr. Murphy also contends that "[w]ell-settled case law and triable issues of fact . . . prevent summary judgment on the merits of Counts I and III."  *Id.* at 17.  He dismisses the Secretary's stated rationale for failing to interview Mr. Murphy—i.e., that Ms. Kendrick relied on an automatically generated score without knowing of Mr. Murphy's age or disability—as "pretext."  *Id.*  He relies on the so-called "cat's paw" analysis and argues that despite Ms. Kendrick's apparent impartiality, the Secretary may still be liable because Mr. Murphy's supervisors exhibited discriminatory animus by repeatedly ignoring his requests for accommodations and help with the job

55

applications, and because Ms. Kendrick acted as a conduit of their prejudice.  *Id.* at 17–22.

In reply, the Secretary argues that he has not waived his objections to timeliness or otherwise forfeited his ability to challenge Mr. Murphy's claims.  *Def.'s Reply* at 3.  Contrary to Mr. Murphy's assertions, the Secretary contends that Mr. Murphy "was afforded every opportunity to clarify the scope of his claims yet failed to do so."  *Id.* at 3–6.  Moreover, the Secretary argues that Mr. Murphy failed to meet the "heavy burden of providing the exceptional circumstances necessary for equitable tolling."  *Id.* at 7–10.  Additionally, he argues that Mr. Murphy's formal EEO complaint precludes him from asserting decades-spanning claims against the Navy and the DLA because those claims fall beyond the scope of any EEO investigation that could reasonably have grown from his formal EEO complaint.  *Id.* at 10.

With respect to the merits of summary judgment on Counts I and III, the Secretary contends that Mr. Murphy improperly characterizes the DLA's purported failures to accommodate as materially adverse employment actions in themselves.  *Id.* at 12–13.  According to the Secretary, "[c]laims based on adverse employment action because of an employee's disability are factually and substantively distinct from those involving failures to accommodate."  *Id.* at 13.  Finally, the Secretary argues that the "cat's paw" analysis is inapplicable, and that Mr. Murphy has not shown that the DLA's justification for failing to interview Mr. Murphy was pretext.  *Id.* at 13–15.

## IV.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it "has the potential to change the outcome of the suit." *Tropigas*, 637 F.3d at 56 (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)). A dispute is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

Once this evidence is supplied by the moving party, the nonmovant must "produce 'specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994)). In other words, the non-moving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)). The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011). However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas*, 637 F.3d at 56 (quoting *Rogan*, 267 F.3d at 27); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

## V.   DISCUSSION

57

A.      **Forty-Five Day Time Bar**

The Secretary argues that procedural constraints imposed under the Rehabilitation Act and the ADEA limit the scope of Mr. Murphy's action to events that occurred forty-five days prior to when Mr. Murphy contacted an EEO counselor on August 23, 2013.  *Def.'s Mot.* at 11–15.  The Rehabilitation Act does not establish its own procedures for claims of discrimination brought under Section 501, 29 U.S.C. § 791.  *See Vazquez-Rivera v. Figueroa*, 759 F.3d 44, 47 (1st Cir. 2014).  Rather, the Act incorporates the procedures set forth in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*  *See id.*  Title VII, in turn, authorizes the EEOC to issue rules and regulations to establish applicable procedures and time limits for filing administrative complaints.  *See id.* (citing 42 U.S.C. § 2000e–16(b)).  One such rule is that an employee must contact his or her agency's EEO counselor "within 45 days of the date of the matter alleged to be discriminatory . . . ."  29 C.F.R. § 1614.105(a)(1).  The employee must contact an EEO counselor within this limitations period in order to exhaust the employee's administrative remedies.  *See Velazquez-Rivera v. Danzig*, 234 F.3d 790, 794 (1st Cir. 2000).  Failure to do so bars the employee from bringing a later court action based on that allegedly discriminatory conduct.  *See Randall v. Potter*, 366 F. Supp. 2d 104, 113 (D. Me. 2005) (citing *Jensen v. Frank*, 912 F.2d 517, 520 (1st Cir. 1990)).

Turning to the ADEA, federal employees who allege age discrimination in violation of federal law have two enforcement options.  *See Rossiter v. Potter*, 357 F.3d 26, 29 (1st Cir. 2004).  An employee may file an administrative complaint against the

agency and then bring suit in a federal district court if dissatisfied with the administrative outcome.  *Id.* (citing 29 U.S.C. § 633a(b)–(c)).  Alternatively, the employee may bypass the administrative process altogether and file a civil action directly in the federal district court.  *Id.* (citing 29 U.S.C. § 633a(c)–(d)).  When—as here—an employee choses the administrative route, the employee must notify an EEO counselor within forty-five days of the alleged discriminatory conduct.  *Maziarz v. Brennan*, No. 15-cv-30098-MAP, 2016 U.S. Dist. LEXIS 130619, at *10 (D. Mass. Aug. 3, 2016); 29 C.F.R. § 1614.105(a)(1).

Hence, in order to exhaust his administrative remedies under both the Rehabilitation Act and the ADEA, Mr. Murphy was required to contact a DLA EEO counselor within forty-five days of date "of the matter alleged to be discriminatory. . . ."  29 C.F.R. § 1614.105(a)(1).  In other words, events that occurred more than forty-five days prior to the date that he contacted the EEO counselor are time barred because he failed to exhaust his administrative remedies with respect to those instances of discrimination.  The First Circuit makes clear that "[t]his exhaustion requirement is no small matter; it 'is a condition of the waiver of sovereign immunity' and thus 'must be strictly construed.'"  *Vazquez-Rivera*, 759 F.3d at 47–48 (quoting *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 94 (1990)).

Strong policy considerations undergird the strict application of the forty-five day limitations period.  In particular, the limitations period "provid[es] the government an opportunity to conciliate while the complaint is fresh and giv[es] early notice to the employer of possible litigation."  *Bartlett v. Dep't of the Treasury (I.R.S.)*,

59

749 F.3d 1, 10 (1st Cir. 2014) (quoting *Kale v. Combined Ins. Co. of Am.*, 861 F.2d 746, 753 (1st Cir. 1988).   By receiving prompt notice of allegedly discriminatory conduct, the government is better able to investigate the allegations and resolve the claim before the parties resort to costly and time-consuming litigation.   Furthermore, the longer the complainant waits to file a claim, the more difficult it becomes for the government to defend itself, especially as government witnesses move, retire, pass away, or simply forget the underlying circumstances of the case.   Hence, to avoid unfairness to the government and to promote the quick resolutions of complaints, courts strictly construe the applicable forty-five day limitations period.

In this case, Mr. Murphy contacted an EEO counselor on August 23, 2013.  Thus, pursuant to the forty-five day cut-off period, no events that occurred prior to July 9, 2013 may provide a basis for relief under the Rehabilitation Act or the ADEA.  Based on the record, the only allegedly discriminatory conduct that falls within this limitations period was the decision not to interview Mr. Murphy for the General Supply Specialist positions on August 22, 2013.

However, Mr. Murphy explains that the forty-five-day limitations period "is mandatory but not jurisdictional and, like a statute of limitations, is subject to equitable exceptions." *Pl.'s Opp'n* at 8 (quoting *Mercado*, 410 F.3d at 50 n.6).  He argues that the exceptions of waiver and equitable tolling apply in the present case, and that as a result, he may assert claims that fall outside the forty-five-day cut-off period.   *Id.* at 7–8.  The Court addresses the exceptions of waiver and equitable tolling in turn.

60

### 1.    Waiver

Mr. Murphy claims that he "repeatedly made clear throughout the EEO process that he intended to submit a complaint that encompassed significantly more issues than the limited discriminatory action on August 22, 2013 . . . ." *Pl.'s Opp'n* at 8.  Put differently, Mr. Murphy asserts that he intended to complain to the DLA EEO about discrimination that occurred outside the forty-five-day limitations period.  Mr. Murphy states that even though "the DLA was on notice of the full extent of Mr. Murphy's claims," the DLA limited its final decision to events that occurred within the forty-five-day period—namely, the August 22, 2013 decision not to interview Mr. Murphy for the General Supply Specialist positions.  *Id.*  As such, Mr. Murphy contends that the DLA waived its right to argue that any of his claims are time barred because (a) the DLA was on notice that some of his claims fell outside the forty-five day limitations period and (b) the DLA failed to object to those untimely claims while reaching the merits of Mr. Murphy's timely claims.  *Id.*  Both aspects of Mr. Murphy's two-part argument fail because (a) the DLA was not on notice of the full extent of Mr. Murphy's claims and (b) the DLA did not reach a decision on the merits of Mr. Murphy's untimely claims.

### a.    Mr. Murphy Failed to Clarify Claims

First, the record does not reveal that the DLA was actually "on notice of the full extent of Mr. Murphy's claims." *Id.*  Rather, the record reveals that Mr. Murphy largely failed to clarify the extent of his claims despite numerous requests and opportunities to do so.  The record indicates that on October 25, 2013, Mr. Murphy

61

filed a pre-complaint with the DLA EEO office. *Decl. of A.U.S.A. Andrew K. Lizotte*, Attach. 3, *EEO Counselor's Rep.* at 9 (ECF No. 98) (*EEO Counselor's Rep.*).  In his pre-complaint, Mr. Murphy asserted illegal employment discrimination, including a failure to promote and unequal pay, and a failure to accommodate. *Id.* at 9–11.  With respect to the failure to promote claim, Mr. Murphy stated, "Despite numerous efforts to obtain a promotion over the years, I have never been given one.  The most recent example is my application for the position of General Supply Specialist, Vacancy 837027, both GS 7 and 9 in August, 2013." *Id.* at 9.  Mr. Murphy goes on to describe the circumstances surrounding his unsuccessful August 2013 application and his subsequent interactions with the Navy and DLA EEO offices. *Id.* at 9–10.  He does not discuss any specific adverse employment actions beyond the August 2013 occurrence. *Id.* at 9–11.  However, at the end of his pre-complaint, Mr. Murphy writes:

> 4.  Timing of the Complaint.  One of the obstacles for my filing of a charge of discrimination has been the barriers maintained by the Navy and its EEO Office.  I cannot hear and I do not read or write English very well.  I am literate only in American Sign Language.  Very little if anything in the DOD/Navy/DLA environment is accessible for someone like me.

*Id.* at 11.

On November 6, 2013, the DLA EEO sent Mr. Murphy's attorney, John Lambert, a "Notice of EEO Rights and Responsibilities" and asked counsel for information regarding "[t]he Job Opportunity Announcement/Vacancy Announcement for which Mr. Murphy was not selected." *Id.* at 27.  On November 20, 2013, Attorney Lambert responded with information "about the August position." *Id.*

at 26. Mr. Murphy's attorney provided no indication that Mr. Murphy's claim encompassed more than the August 2013 decision not to hire Mr. Murphy.

On January 7, 2014, Mr. Murphy and Attorney Lambert signed an "Agreement to Mediate Dispute." *Decl. of A.U.S.A. Andrew K. Lizotte*, Attach. 2, *Agreement to Mediate Dispute—EEO Pre-Compl.* (ECF No. 98). The agreement contained a description of Mr. Murphy's claims. *Id.* at 2. In describing the failure to promote claim, the agreement focused exclusively on the August 22, 2013 incident:

> Was Mr. Michael Murphy discriminated against based on Age (over 40; month and year not provided) and Disability (Physical: Deaf) when [on] August 22, 2013 he believes the Agency failed to promote him for [the General Supply Specialist positions], and he believes coworkers he has had to train are in a higher wage grade (no dates provided for the occasions he trained coworkers that were of a higher grade).

> Was Mr. Murphy discriminated against based on Disability (Physical: Deaf) when he alleges there is a failure to accommodate because of a lack of Deaf friendly culture and despite a[] Deaf [Affinity] group [] in place for Deaf employees, profound changes are still needed (no date(s) provided when he requested accommodations or when they were denied.

*Id.* There is no evidence that Mr. Murphy or Attorney Lambert disagreed with the description of Mr. Murphy's claims.

On January 23, 2014, the DLA EEO provided Attorney Lambert with an "EEO Counselor's Report." *See EEO Counselor's Rep.* The report contained a "Precise Description of the Claim(s) Mediated," which replicated the description of the claims set forth in the "Agreement to Mediate Dispute" that Mr. Murphy and Attorney Lambert signed on January 7, 2014. *Id.* at 2–3. Also on January 23, the DLA EEO sent Attorney Lambert a notice of a right to file a formal complaint of discrimination. *Decl. of A.U.S.A. Andrew K. Lizotte*, Attach. 4, *Agreement to Mediate Dispute—EEO*

*Pre-Compl.* at 2 (ECF No. 98) (*Notice of Right to File*).   The notice contained instructions for filing, including the requirement that the complaint must:

> b.  Specifically describe your client's claim or claims . . . (Please Note: Your client's claim must contain only those issues either specifically discussed with your client's EEO Counselor or issues that are like or related to the issues that you discussed with your client's EEO Counselor.)

*Id.* at 2.  The notice provided a list of the "issues specifically discussed with [the] EEO Counselor," which again mirrored the description of the claims in the "Agreement to Mediate Dispute."  *Id.* at 3.  Again, there is no evidence that Mr. Murphy or Attorney Lambert objected to the DLA EEO's characterization of Mr. Murphy's claims in either the EEO Counselor's Report or the notice.

On February 7, 2014, Mr. Murphy filed his formal complaint, but instead of using the opportunity to correct the DLA EEO's characterization of the claims, Mr. Murphy attached the original October 25, 2013 pre-complaint as the statement of his claim.  *Stip.*, Attach. 3, *Formal Compl. of Discrimination in the Fed. Gov't* at 4–7 (ECF No. 60) (*Formal Compl.*).   On February 21, 2014, the DLA EEO sent Attorney Lambert a letter requesting, among other things, confirmation of its interpretation of Mr. Murphy's claim.  *Redacted Documents*, Attach. 7, *Feb. 21, 2014 Letter* (ECF No. 102) (*Clarification Letter*).  The DLA EEO once again set forth the same description of Mr. Murphy's complaint that appeared in the "Agreement to Mediate Dispute," the EEO Counselor's Report, and the notice of Mr. Murphy's right to file.  *Id.* at 2.  The letter stated, "**Please clarify in writing if the above incidents are not correctly defined.**"  *Id.*

On March 3, 2014, Attorney Lambert responded, "I see little point in going through the time and effort to respond to this information with the mediation coming up. Accordingly, I will plan to respond to your information in the event that mediation is not successful . . . ." *Decl. of A.U.S.A. Andrew K. Lizotte*, Attach. 6, *Mar. 3, 2014 Letter* (ECF No. 98). On March 14, 2014, after mediation proved unsuccessful, the DLA EEO sent another letter to Attorney Lambert that again included the DLA EEO's description of Mr. Murphy's claims. *Redacted Documents*, Attach. 8, *Mar. 14, 2014 Letter* (ECF No. 102). The letter stated:

> If you or your client believe the above claim is not correctly defined, please notify me . . . within five calendar days after your receipt of this letter, specifying why you and your client believe the claim is not correctly defined. If you and your client fail to contact me, I will conclude you both agree the claim is properly defined.

*Id.* at 2. There is no evidence that Mr. Murphy or Attorney Lambert responded to clarify that the failure to promote claim encompassed more than the August 22, 2013 incident.

The DLA's investigation into Mr. Murphy's formal complaint stretched from March 18 to April 24, 2014. *Redacted Documents*, Attach. 10, *Report of Investigation* at 2 (ECF No. 102). On May 1, 2014, Mr. Murphy completed a "Declaration Under Penalty of Perjury" that requested further details about the factual circumstances of the case. *Murphy EEO Decl.* at 1–13. Near the top of the Declaration appeared the same description of Mr. Murphy's claims that appeared throughout the pre-complaint and investigatory stages. *Id.* at 1. Below that description, Mr. Murphy wrote:

> Disclaimer.

> Mr. Murphy, through Counsel, disputes that the statements above constitute a correct description of his claims. He relies on the responses below to articulate the full scope of his claims.

*Id.* The Declaration also contained the following question and response:

> 3. During the period at issue (August 22, 2013), what was your position, series, grade, and geographical location?

> A. Actually, August 22, 2013 is not the period at issue necessarily. This complaint has been filed because I have never been promoted or given any other opportunities over the decades I have been here and I have been stuck in the same position and WG 6 since about 1985 while my peers and co-workers have moved on to better situations.

*Id.* at 2.

On May 27, 2014, the DLA EEO sent Attorney Lambert a copy of the completed Report of Investigation. *See Report of Investigation*. The Report was based on the DLA EEO's interpretation of Mr. Murphy's claims—namely, that Mr. Murphy only intended to assert a failure to promote claim related to the August 22, 2013 incident. *Id.* at 2. That same day, the DLA EEO contacted Attorney Lambert to notify him of Mr. Murphy's option to elect either a hearing and decision before an Administrative Law Judge (ALJ) or a final decision directly from the DLA. *Decl. of A.U.S.A. Andrew K. Lizotte*, Attach. 10, *May 27, 2014 Letter* at 5–6 (ECF No. 98). By letter dated June 4, 2014, Attorney Lambert "disagree[d]" that the Report of Investigation was complete; however, Attorney Lambert did not specifically dispute the Report's characterization of the claims. *Decl. of A.U.S.A. Andrew K. Lizotte*, Attach. 10, *June 4, 2014 Letter* at 3 (ECF No. 98). Nevertheless, Attorney Lambert requested a final DLA decision. *Id.*

66

The DLA issued the Final Agency Decision on December 11, 2014. *Decl. of Abigail C. Varga*, *Esq.*, Ex. B, *Final Agency Decision of the DLA in the Discrimination Compl. of Mr. Michael Murphy* (ECF No. 80). The decision noted that the DLA "requested clarification of [Mr. Murphy's] claims" and that the DLA "made attempts to obtain clarification of [Mr. Murphy's] claim during the EEO Informal Pre-Complaint stage of the process but was unsuccessful." *Id.* at 6.

The Court provides this extensive background to demonstrate that the record does not establish—as Mr. Murphy contends—that "the DLA was on notice of the full extent of Mr. Murphy's claims . . . ." *See Pl.'s Opp'n* at 8. The way that Mr. Murphy worded his pre-complaint and subsequent formal complaint strongly suggested that he intended to complain specifically about the August 2013 failure to hire. In particular, he wrote, "Despite numerous efforts to obtain a promotion over the years, I have never been given one. The most recent example is my application for the position of General Supply Specialist, Vacancy 837027, both GS 7 and 9 in August, 2013." *EEO Counselor's Rep.* at 9. He then went on to describe in detail the circumstances surrounding his unsuccessful August 2013 application without mentioning any other specific adverse employment actions. *Id.* at 9–11. From this, it is reasonable to conclude that Mr. Murphy referred to his failure to receive a promotion "over the years" as a way to place the August 2013 episode in context and not as a way to complain about specific instances of discrimination in the past.

Even assuming that Mr. Murphy did intend to assert decades' worth of employment discrimination in his formal complaint, the EEO process afforded him

numerous opportunities to clearly define the extent of his claims.  Contrary to Mr.
Murphy's assertion, the record simply does not show that he "repeatedly made clear
throughout the EEO process that he intended to submit a complaint that
encompassed significantly more issues than the limited discriminatory action on
August 22, 2013." *Pl.'s Opp'n* at 8.  Rather, the record indicates that the DLA
repeatedly asked Mr. Murphy if its interpretation of his failure to promote claim was
correct.  Only once, on May 1, 2013—after the official investigation into Mr. Murphy's
claim was complete—did Mr. Murphy call into question the DLA's characterization
of his claims.  Even then, his qualification was cryptic.  *See Murphy EEO Decl.* at 2
("Actually, August 22, 2013 is not the period at issue necessarily . . . never promoted
. . . over the decades").  It is also significant that Mr. Murphy did not attempt to clarify
his claim again on May 27, 2014, when he obtained the Report of Investigation based
on the DLA's supposedly flawed characterizations of his claims.  Rather, Mr. Murphy
opted to move directly to a final decision by the DLA.  Given this record, the Court
cannot say that "the DLA was on notice of the full extent of Mr. Murphy's claims,"
much less that the DLA waived any argument that Mr. Murphy's claims are time
barred.

In sum, the Court finds that throughout the pre-complaint, complaint, and
investigatory stages at the administrative level, Mr. Murphy placed the onus on the
DLA to interpret the meaning of his claims, while providing minimal effort to clarify
his complaint or correct the DLA's interpretations.  Mr. Murphy may not now argue
that because the DLA interpreted his claims too narrowly, the Secretary is precluded

from seeking summary judgment on other claims that Mr. Murphy had in mind.  To hold otherwise would be to reward Mr. Murphy for his lack of responsiveness at the administrative level.  Accordingly, the Court holds that the Secretary has not waived his objections to timeliness or otherwise forfeited his ability to challenge Mr. Murphy's claims.

### b.    The DLA Did Not Reach the Merits of Untimely Claims

The Court turns to the second part of Mr. Murphy's waiver argument.  Mr. Murphy contends that the DLA's failure to object to his untimely claims—those that arose before July 9, 2013—while reaching the merits of Mr. Murphy's timely claims—the August 22, 2013 failure to promote—bars the DLA from now raising timeliness objections to any of Mr. Murphy's claims.[67]  *Id.* at 10–11.  (citing *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016) (quoting *Ester v. Principi*, 250 F.3d 1068, 1071–72 (7th Cir. 2001)); *Ramirez v. Sec'y, U.S. Dept. of Transp.*, 686 F.3d 1239, 1252 (11th Cir. 2012).

The cases that Mr. Murphy cites in support of this proposition differ in critical ways from the present situation.  In *Formella*, the Seventh Circuit held that an agency waived a timeliness objection regarding an otherwise untimely claim because the agency reached the merits of the untimely claim in its Final Agency Decision without addressing the timeliness issue.  817 F.3d at 511.  In *Ester*, the agency ruled on the merits of the plaintiff's formal complaint and the plaintiff filed suit in federal

---

[67]    This, of course, assumes the first part of Mr. Murphy's argument—that the DLA was aware that Mr. Murphy intended to raise untimely claims.  As the Court concluded in its analysis of the first part of Mr. Murphy's waiver argument, this is far from clear.  *See* Section IV.A.1.a.

district court. 250 F.3d at 1071. The agency then asserted for the first time that the plaintiff did not file his formal complaint with the agency in a timely manner. *Id.* The Seventh Circuit held that because the agency reached the merits of the complaint, without addressing the question of timeliness, it waived its timeliness defense. *Id.* at 1071–72.

In *Ramirez*, the agency dismissed the plaintiff's formal complaint of discrimination as time barred. 686 F.3d at 1246. On appeal, the EEOC reversed and remanded the agency's decision because it found that the plaintiff had no way of knowing about the forty-five-day time bar. *Id.* The agency did not appeal the ruling or move for reconsideration; instead, it began an investigation into the merits of the plaintiff's claims and found that there was no discrimination. *Id.* The plaintiff brought suit in federal district court, and the agency again raised a timeliness objection. *Id.* at 1247. The Eleventh Circuit held that because the agency failed to challenge the EEOC finding of timeliness, it waived any subsequent objection on timeliness grounds. *Id.* at 1252. Thus, in *Formella*, *Ester*, and *Ramirez*, the agencies reached the merits of the untimely claims without raising timeliness objections—or, in the case of *Ramirez*, challenging the EEOC finding of timeliness. As such, the agencies waived their rights to subsequently raise timeliness objections at the district court.

In this case, however, the DLA did not reach the merits of Mr. Murphy's untimely claims. There was no reason to. The only claims that the DLA investigated and adjudicated were Mr. Murphy's timely claims, including the claim that arose as

70

a result of the August 22, 2013 decision not to promote Mr. Murphy.  Because the DLA did not adjudicate the untimely claims, it did not need to object to the untimely claims.  Consequently, the DLA has not waived its right to object to Mr. Murphy's current efforts to insert untimely claims into his suit against the DLA.  *See Mercado*, 410 F.3d at 45 (holding that an employer did not waive its timeliness defense by failing to raise an objection before the EEOC because the EEOC never reached the merits of the employees' allegedly untimely claims).

### 2.    Equitable Tolling[68]

Mr. Murphy also urges the Court to equitably toll the forty-five-day time limit because had no notice or other knowledge of the limitations period.  *Pl.'s Opp'n* at 11–15.  At the outset, the Court notes the First Circuit's instruction to "interpret the doctrine of equitable tolling quite narrowly, particularly in suits against the government."  *Farris v. Shinseki*, 660 F. 3d 557, 563 (1st Cir. 2011) (quoting *Benitez-Pons v. Com. of Puerto Rico*, 136 F.3d 54, 61 (1st Cir. 1998)).  It is "[o]nly in exceptional circumstances" that equitable tolling will extend a filing deadline, and the "heavy burden" of "prov[ing] entitlement to equitable relief lies with the complainant."  *Bartlett*, 749 F.3d at 10 (1st Cir. 2014) (quoting *Irwin*, 498 U.S. at 94) (internal quotation marks omitted).

When deciding whether to allow equitable tolling, courts generally weigh five factors: "(1) the lack of actual notice of the filing requirement; (2) lack of constructive

---

[68]    Mr. Murphy states that "the exceptions of waiver, estoppel, and equitable tolling are all applicable to defeat the Defendant's attempt to limit Mr. Murphy's claim."  *Pl.'s Opp'n* at 8.  Mr. Murphy limits his discussion to waiver and equitable tolling and makes no argument regarding equitable estoppel.  Consequently, the Court limits its analysis to waiver and equitable tolling.

knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the defendant; and (5) a plaintiff's reasonableness in remaining ignorant of the [filing] requirement." *Mercado*, 410 F. 3d at 48. In *Kale v. Combined Insurance Company of America*, 861 F.2d 746, 753 (1st Cir. 1988), the First Circuit set out the proper analytical path.[69] First, the district court should determine whether the plaintiff had actual or constructive knowledge of his rights under the ADEA or Rehabilitation Act. *Bartlett*, 749 F.3d at 10 (quoting *Kale*, 861 F.2d at 753). "Actual knowledge occurs where an employee either learns or is told of his [] rights, even if he becomes only generally aware of the fact that there is a statute outlawing [] discrimination and providing relief therefor." *Id.* (quoting *Kale*, 861 F.2d at 753) (alteration added). By contrast, "constructive knowledge . . . is 'attributed' to an employee in situations where he has retained an attorney, or where an employer has fulfilled his statutory duty by conspicuously posting the official EEOC notices that are designed to inform employees of their [] rights." *Id.* (quoting *Kale*, 861 F.2d at 753) (alteration added) (citations omitted).

If the court determines that the plaintiff had actual or constructive knowledge of his rights, then "ordinarily there could be no equitable tolling based on excusable ignorance." *Id.* (quoting *Kale*, 861 F.2d at 753) (emphasis omitted). However, if the employee has no actual or constructive knowledge of his rights and his ignorance is

---

[69]     *Kale* described the proper analytical path "[i]n the context of ADEA cases where a plaintiff is claiming excusable ignorance of the filing deadline . . . ." 861 F.2d 746. Presumably, the same approach applies to cases involving alleged discrimination under the Rehabilitation Act. *See Maziarz v. Brennan*, No. 15-cv-30098-MAP, 2016 U.S. Dist. LEXIS 130619, at *23–24 (D. Mass. Aug. 3, 2016) (applying *Kale* to the Rehabilitation Act as well as the ADEA).

due to the defendant's misleading conduct or the defendant's failure to post the required EEOC notices, then "[t]he court should also assess any countervailing equities against the plaintiff." *Kale*, 861 F.2d at 753. In particular, the court should ask:

> [D]id he diligently pursue his claim, was his ignorance of his rights reasonable under the circumstances, and would allowing equitable tolling still fulfill the basic purposes behind the limited filing period—namely, providing the government an opportunity to conciliate while the complaint is fresh and giving early notice to the employer of possible litigation.

*Bartlett*, 749 F.3d at 10 (quoting *Kale*, 861 F.2d at 753). Finally, even if the court finds that the above factors call for equitable tolling, it must then take into account the degree to which the delay prejudices the defendant. *Id.* at 11 (quoting *Kale*, 861 F.2d at 753).

Based on the record in this case, the Court concludes that Mr. Murphy had "actual knowledge" of the filing requirements. That is, the record reflects that Mr. Murphy was "generally aware of the fact that there is a statute outlawing [age and disability] discrimination and providing relief therefor." *Id.* at 10 (quoting *Kale*, 861 F.2d at 753). In his interrogatory responses, Mr. Murphy states, "I went to the EEO Office because I was told that was the appropriate place to assert a discrimination complaint based on my age and disability." *Murphy Interrogs. I* at 15. Although it is not clear from this interrogatory response exactly when Mr. Murphy was informed that he could go to the EEO to file a complaint, the factual record reveals that as early as 2005, Mr. Murphy approached the Navy EEO to complain about not receiving a promotion on account of his disability. PSAMF ¶¶ 157–59; DRPSAMF ¶¶ 157–59.

In 2006, Mr. Murphy again complained to the EEO about not being promoted. PSAMF ¶ 163; DRPSAMF ¶ 163. Also in 2006, Mr. Murphy obtained legal counsel, who communicated with Shipyard attorneys regarding Mr. Murphy's inability to obtain a promotion. *See Murphy Interrogs. I* at 6–7; *Decl. of A.U.S.A. Andrew K. Lizotte*, Attach. 12, *December 4, 2006 Letter* at 2 (ECF No. 98) (*Attorney Wiant Letter*). In 2007, Mr. Murphy filed another complaint with the Navy EEO after being passed over for a promotion. *Murphy Interrogs. I* at 15–16. In connection with that complaint, the EEO sent Mr. Murphy a "Notice of Complainant's Rights and Responsibilities," which Mr. Murphy signed. *Decl. of A.U.S.A. Andrew K. Lizotte*, Attach. 13, *Notice of Complainant's Rights and Responsibilities* at 2–9 (ECF No. 98).

Moreover, in 2010, following his transfer to the DLA, Mr. Murphy participated in a video conference with a DLA EEO Disability Program Manager translated by an ASL interpreter. DSMF ¶ 17; PRDSMF ¶ 17. During the video conference, Mr. Murphy was notified that the DLA EEO office located in Columbus, Ohio, would provide EEO services to him as a DLA employee, and that if he had any concerns or issues with the DLA, that EEO contacts in the Ohio office would provide him with assistance. DSMF ¶ 18; PRDSMF ¶ 18.

These facts indicate that Mr. Murphy was at least "generally aware" that there were laws prohibiting employment discrimination and providing avenues for relief. Further, the record demonstrates that Mr. Murphy knew to approach the EEO to complain about perceived discrimination, and upon his transfer to the DLA, Mr. Murphy was notified through an ASL interpreter that the DLA EEO would provide

service to him.[70]  As such, the Court concludes that Mr. Murphy possessed "actual knowledge" of his rights under the ADEA and the Rehabilitation Act for purposes of the equitably tolling analysis.

Furthermore, "constructive knowledge" can be attributed to an employee "where an employer has fulfilled his statutory duty by conspicuously posting the official EEOC notices that are designed to inform employees of their [] rights." *Bartlett*, 749 F.3d at 10 (quoting *Kale*, 861 F.2d at 753).  Mr. Murphy does not appear to assert that the DLA failed to post the required DLA notices conspicuously.[71]

---

[70]     Mr. Murphy argues that the fact that he mistakenly approached the Navy EEO instead of the DLA EEO in this case provides evidence that the DLA did not provide him with sufficiently clear information about the EEO process, and thus he did not have actual knowledge of the limitations period.  *Pl.'s Opp'n* at 13–14.  Yet the fact that Mr. Murphy approached the wrong EEO office in this case does not impact the Court's "actual knowledge" analysis.  The "actual knowledge" inquiry seeks to determine if Mr. Murphy had general awareness of the relevant discrimination statutes and knew that those statutes provided opportunities for relief.  The fact that Mr. Murphy approached an EEO office to complain about discrimination satisfies this actual knowledge standard.
        The Court also notes that Mr. Murphy's error in bringing his complaint to the Navy EEO office rather than the DLA EEO office does not prejudice Mr. Murphy in the context of this lawsuit.  Perhaps recognizing that there was some confusion about which EEO office serviced DLA employees at the Shipyard, the Secretary has agreed to use the date of Mr. Murphy's first contact with the Navy EEO as the benchmark for the forty-five-day limitations period in this case.  That is, the Secretary is not seeking to penalize Mr. Murphy for approaching the wrong EEO office.

[71]     The record is opaque on this issue.  The Secretary's statement of material facts did not mention the posting of the DLA notices.  DSMF ¶¶ 1–87.  In his response, Mr. Murphy cited two cases that stand for the proposition that even if the DLA notices were posted, there may still be a question as to whether the notices were conspicuously posted.  *Pl.'s Opp'n* at 13–14 (citing *Cano v. U.S. Postal Serv.*, 755 F.2d 221, 222–23 (1st Cir. 1985); *DesRoches v. U.S. Postal Serv.*, 631 F. Supp. 1375, 1381 (D.N.H. 1986)).  However, in *Bartlett*, the First Circuit noted that the Postal Service had established by affidavit that its notices were conspicuously posted and the employee had not challenged its assertion.  749 F.3d at 11.  In those circumstances, the *Bartlett* Court wrote that the employee "has not carried her burden of showing a lack of constructive knowledge of the filing requirements."  *Id.*
        In its reply, the Secretary pointed out that Mr. Murphy himself attached to his response the deposition of Donna Shepheard, who testified that the DLA notices were posted on the "official bulletin board which is on the sixth floor of Building 153," a building where a majority of the DLA employees work and where there is a cafeteria.  *Shepheard Dep. at* 123:15—22.
        In light of Ms. Shepheard's testimony, it is difficult to know whether Mr. Murphy is really challenging in good faith the conspicuous nature of the posting of the DLA notice.  As he raised the legal issue in his response as to whether the notice was conspicuous, he could have provided a factual backup for his concern in his statement of additional facts, namely that the notice was not as a matter of fact conspicuously placed.  He did not.  PSAMF ¶¶ 1–210.  But he did attach to his response a deposition of an employer representative whose testimony satisfies the Secretary's burden of

75

Indeed, Ms. Shepheard testified that the DLA posted the required EEO notices on the official bulletin board in the same building that houses the majority of DLA employees, as well as a cafeteria. *Shepheard Dep.* at 123:15–22. Rather, Mr. Murphy argues that as a result of his deafness and corresponding inability to read, the postings were not reasonably geared to inform him of the applicable time limits. *Pl.'s Opp'n* at 73.

The Court is sensitive to Mr. Murphy's concerns. Even a conspicuous EEO notice is of little use to an employee who has limited reading abilities or is unable to fully understand the information contained in the posting. At the same time, the Secretary points out that Mr. Murphy signed a "Notice of Complainant's EEO Rights and Responsibilities" in April 2007 in connection with his previous EEO complaint. *Def.'s Reply* at 9 n.7. Additionally, other courts have held that an employee's illiteracy or learning disability do not justify tolling the limitations period as long as the employer conspicuously posts the required EEO notices. *See Everage v. Runyon*, 998 F.2d 1016, 1016 (7th Cir. 1993) (unpublished) (affirming the conclusion that the plaintiff's poor reading ability did not justify tolling the time limit where the plaintiff was given constructive notice of the applicable time limits by way of posted notices

---

conspicuous posting. The *Bartlett* Court indicates that once there is evidence before the Court of conspicuous posting, the burden shifts to the employee to demonstrate a lack of constructive knowledge. Based on this record and in accordance with *Bartlett*, the Court concludes that the Secretary has met his burden of demonstrating that the posting was conspicuous and Mr. Murphy has not satisfied his burden of providing evidence to the contrary.

Unlike the issue of Attorney Wiant's 2006 letter, discussed below, which the Secretary saved for his reply, Mr. Murphy raised the question of conspicuous posting in his response and provided the answer in the deposition testimony of Ms. Shepheard. Therefore, the Court will consider the factual issue raised and answered even though the parties have not posited the facts in their statements of material fact.

on bulletin boards at his workplace); *Everage v. Frank*, No. 90-C-0712, 1992 U.S. Dist. LEXIS 21585, at *11–12 (E.D. Wis. Jul. 13, 1992); *Gessner v. Runyon*, Civil Action No. 96-7521, 1997 U.S. Dist. LEXIS 16642 (E.D. Pa. Oct. 22, 1997) (refusing to grant equitable tolling where agency posted required notices even though employer was "well aware of Plaintiff's learning and mental disabilities"); *see also Felder v. Johnson*, 174 F.3d 710, 715 (5th Cir. 1999) (noting that illiteracy and deafness do not support equitable tolling of the AEDPA statute of limitations).  As a practical matter, whether an employee actually reads (or is able to read) the notice would seem to be a question of actual, not constructive notice.[72]

To complicate the question of constructive notice, Mr. Murphy's 2006 consultation with an attorney may well be enough to constitute constructive notice of the filing requirements.  Attached to the Secretary's reply to Mr. Murphy's response to the statements of material fact is a copy of a letter dated December 4, 2006, from Attorney Wiant of the Disabilities Rights Center of Concord New Hampshire to Scott W. Flood, Assistant Counsel of the Department of the Navy in Portsmouth, New Hampshire, following up on "Michael Murphy's concerns regarding regularly being passed over for promotion."  *Attorney Wiant Letter* at 2.  In *Cano v. U.S. Postal Serv.*, 755 F.2d 221 (1st Cir. 1985), the First Circuit wrote that "[s]ince Cano had consulted with an attorney about her employment difficulties just prior to the beginning of the limitations period and subsequently, she could be charged with constructive notice of

---

[72]   Constructive notice provides something of a safe harbor for an employer.  So long as the employer conspicuously posts the notice, it cannot be responsible for making sure its employees actually stop and read it or having read it, understand and remember the contents.

the relevant Title VII provisions and the procedural requirements of filing an EEO complaint." *Id.* at 222. "[C]ourts generally impute constructive knowledge of filing and service requirements to plaintiffs who . . . consult with an attorney." *Farris*, 660 F.3d at 565 (quoting *Kelley v. Nat'l Labor Relations Bd.*, 79 F.3d 1238, 1249 (1st Cir. 1996)).

However, the Secretary presented evidence of the 2006 Attorney Wiant letter in support of his qualified response to Mr. Murphy's additional statement of fact paragraph 156, which reads: "Mr. Murphy was never informed of a 45-day time limitation for EEO Complaints during this or any other meeting with or without an ASL interpreter." PSAMF ¶ 156; DRPSAFM ¶ 156. Because it was revealed only in the Secretary's reply, Mr. Murphy has never had an opportunity to respond to the Wiant letter, to admit or deny its authenticity, or to explain his view of the letter. Moreover, the Secretary raised the letter only in a footnote in his reply memorandum. *Def.'s Reply* at 8, n.7. Although it may provide a separate basis for finding constructive notice of the filing requirements, the Court is reluctant to grant summary judgment on the theory of constructive notice based on legal representation since it was not raised in the Secretary's motion and since Mr. Murphy has never had the opportunity to respond to it.[73]

---

[73]      In its discussion of waiver, the Court relies on documents that the Secretary referenced for the first time in its response to Mr. Murphy's statement of additional material facts, including correspondence between Mr. Murphy and the DLA EEO. PSAMF ¶¶ 209–10; DRPSAMF ¶¶ 209–10. As with the Wiant letter, Mr. Murphy did not have an opportunity to respond to these record materials. The Court relied on such materials in the context of waiver because the documents directly supported the factual assertions underlying the Secretary's defense of Mr. Murphy's waiver argument—for instance, that the DLA EEO in fact sought clarification of Mr. Murphy's claims on a certain date. Moreover, the documents appear to be what they purport to be, and it is not necessary to go outside the documents themselves in order to draw conclusions for purposes of this motion. Finally, the

Nevertheless, the Court concludes that the Secretary has demonstrated that he conspicuously posted the DLA notice, and under *Bartlett*, in the absence of evidence to the contrary, the Court concludes that Mr. Murphy "has not carried [his] burden of showing a lack of constructive knowledge of the filing requirements." *Bartlett*, 749 F.3d at 11.

The Court could stop here. *See Kale*, 861 F.2d at 753 ("If the court determines that the plaintiff had actual or constructive knowledge of his rights, then 'ordinarily there could be no equitable tolling based on excusable ignorance'"). For completeness, the Court briefly addresses one other equitable tolling factor that weighs heavily against Mr. Murphy—namely, prejudice to the Secretary. Mr. Murphy's allegations of employment discrimination span multiple decades and two distinct agencies within the Department of Defense. *See, e.g.,* PSAMF ¶ 99 ("Mr. Murphy has never received a promotion in his 37 year tenure at the Shipyard"); PSAMF ¶ 100 ("For over thirty-five (35) years, Mr. Murphy has consistently expressed to his supervisors, co-workers, EEO Specialists, Shipyard counsel, and others, his desire to be promoted); PSAMF ¶ 91 (asserting that Butch Fanjoy—Mr. Murphy's supervisor at the Navy during the 1980's—told him that he would never get promoted).

---

Secretary's initial statement of material facts contained eight-seven paragraphs. DSMF ¶¶ 1–87. Mr. Murphy responded with 210 additional facts. PSAMF ¶¶ 1–210. For the Secretary to respond to the additional facts, he posited documents not contained in his initial statement. Although the better practice would have been to ask the Court for another round of response and reply so that Mr. Murphy could respond to the newly-referenced documents, the Court is satisfied, given the nature of the documents, that it is unlikely they are disputed.

By contrast, with the Wiant letter, however, the Secretary asks the Court to conclude that Mr. Murphy had constructive notice of the limitations period, even though the letter says nothing about the extent of Mr. Murphy's actual communications with Attorney Wiant. The Court is hesitant to make such a conclusion without affording Mr. Murphy an opportunity to argue that his communications with Attorney Wiant did not constitute constructive notice.

As discussed previously, the purpose of the limitations period is to "provid[e] the government an opportunity to conciliate while the complaint is fresh" and to "giv[e] early notice to the employer of possible litigation." *Bartlett*, 749 F.3d at 10 (quoting *Kale*, 861 F.2d at 753). Permitting Mr. Murphy to assert claims of discrimination stretching back several years would frustrate the purposes of the limitations period and prejudice the Secretary. The Secretary did not have the opportunity to conciliate or investigate these untimely claims when they occurred, and any investigation into the older claims would necessarily be complicated by the fact that many of the individuals in Mr. Murphy's prior Navy chain of command have retired or are now deceased. DSMF ¶¶ 8–9; PRDSMF ¶¶ 8–9.[74]

The Court therefore concludes that the Mr. Murphy has not met his "heavy burden" of proving that he is entitled to equitable tolling. *Bartlett*, 749 F.3d at 10. The instant case does not present the "exceptional circumstances" necessary to justify extending the filing deadline. *Id.* Rather, the Court finds that Mr. Murphy had

---

[74]    Mr. Murphy states that "for years, [he] consistently attempted to communicate his frustration to his supervisors and the Shipyard management of both his failure to achieve a promotion, as well as the failure of reasonable accommodations . . . ." *Pl.'s Opp'n* at 14. He then cites caselaw for the proposition that a complainant may satisfy the criterion of EEO counselor contact by initiating contact with "any agency official logically connected with the EEO process . . . ." *Id.* at 14–15 (citing *Pagan v. United States*, CV: 14-1795, 2016 U.S. Dist. LEXIS 92486, at *10–11 (D.P.R. July 14, 2016) (quoting *Culpepper v. Shafer*, 548 F.3d 1119, 1122 (8th Cir. 2008)). In effect, Mr. Murphy argues that by communicating his complaints to his supervisors and DLA management, he effectively initiated contact with an EEO Counselor. *Id.* Accordingly, the Court should expand the limitations period beyond the forty-five days prior to when he officially contacted an EEO counselor on August 23, 2013.
    However, neither *Pagan* nor *Culpepper* holds that a supervisor is an "agency official logically connected with the EEO process." In *Pagan*, the Court held that "[t]he director of the local office of the EEOC is certainly an 'agency official logically connected with the EEO process . . . .'" *Pagan*, 2016 U.S. Dist. LEXIS 92486, *at 14. Similarly, in *Culpepper*, the Eighth Circuit held that "the director of an agency's office of civil rights is logically connected to the EEO process." 548 F.3d at 1123. The agency officials in *Pagan* and *Culpepper* were both closely associated with the EEO process and workplace discrimination. The same cannot be said of supervisors or management in general. The Court is unwilling to stretch the holdings of *Pagan* and *Culpepper* to incorporate all supervisors as "agency officials logically connected with the EEO process."

"actual knowledge" of the filing deadline as that term applies in the First Circuit, and that extending the deadline would prejudice the Secretary and run counter to the purposes of the limitations period.

### 3.   29 C.F.R. § 1614.105(a)(2)

Mr. Murphy also attempts to justify extending the limitations period by pointing directly to 29 C.F.R. § 1614.105(a)(2), which states that "The agency or the Commission shall extend the 45-day time limit . . . when the individual shows that he or she was not notified of the time limits and was not otherwise aware of them . . . ."

In *Harris v. Gonzales*, 488 F.3d 442 (D.C. Cir. 2007), the Court of Appeals for the District of Columbia held that given subsection (a)(2)'s mandatory language— "the agency . . . shall extend the 45-day time limit"—an agency must grant an extension if the employee shows that he "was not notified" or "otherwise aware" of the time limit. *Id.* at 444. That is, subsection (a)(2) provides an independent basis for extending the time limit that does not need to meet the more demanding common law standard of equitable tolling, which is granted only in "extraordinary and carefully circumscribed circumstances." *Id.* (quoting *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 580 (D.C. Cir. 1998)). Accordingly, courts should extend the time limit unless the employee had actual knowledge of the filing requirement, or else constructive notice—namely, notice that was "reasonably geared to inform the

complainant of the time limits." *Id.* at 445 (quoting *Johnson v. Runyon*, 47 F.3d 911, 918 (7th Cir. 1995)).[75]

Although the First Circuit has addressed 29 C.F.R. § 1614.105(a)(1) on a number of occasions, the parties have cited and the Court has found no First Circuit caselaw interpreting 29 C.F.R. § 1614.105(a)(2).[76] It is unknown, therefore, whether in light of the strict standard the First Circuit has imposed on equitable tolling, the First Circuit would join the District of Columbia, Fifth, and Seventh Circuits in applying a more lenient standard to the application of § 1614.105(a)(2) than the First Circuit applies to equitable tolling. As those circuits discussed, the language "shall extend" provides a textual justification for viewing § 1614.105(a)(2) as directing more relaxed treatment of the 45-day notice provision than general equitable tolling would allow.

Yet even if the Court follows *Harris*' lead, the Court still concludes that extending the limitations period in this case would be inappropriate. As discussed above, based on this record, the Court finds that Mr. Murphy had "actual notice" of the filing requirement as that term is understood in the First Circuit. To briefly summarize, the record indicates that as early as 2005, Mr. Murphy approached the

---

[75]    For support, Mr. Murphy cites *Ramirez v. Sec'y, U.S. Dep't of Transp.*, 686 F.3d 1239 (11th Cir. 2012), as stating that "[t]he regulations thus provide that the 45-day rule 'shall' be extended if the employee 'was not notified of the time limits and was not otherwise aware of them . . . .'" Mr. Murphy accurately quotes *Ramirez*. *Id.* at 1243. But the Eleventh Circuit merely quoted 29 C.F.R. § 1614.105(a)(2); it did not interpret the language.

[76]    In 2004, a court within this circuit held that subsection (a)(2) "allows the agency . . . to extend the 45-day time limit if certain circumstances are found," and therefore, determining whether the time limit should be extended "is a matter for the agency, not this Court, to decide in the first instance." *Lebron-Rios v. United States Marshal Serv.*, 307 F. Supp. 2d 335, 340 (D.P.R. 2004). If *Lebron-Rios* is correct, there is no evidence in this case that Mr. Murphy ever presented a § 1614.105(a)(2) argument to the agency here.

Navy EEO to complain about not receiving a promotion on account of his disability. PSAMF ¶¶ 157–59; DRPSAMF ¶¶ 157–59. Likewise, in 2006, Mr. Murphy complained to the EEO about not being promoted, PSAMF ¶ 163; DRPSAMF ¶ 163, and obtained outside legal counsel. *See Murphy Interrogs. I* at 6–7. In 2007, Mr. Murphy filed another complaint with the Navy EEO after being passed over for a promotion and received written notice of his rights and responsibilities in connection with the EEO process. *Murphy Interrogs. I* at 15–16; *Notice of Rights and Responsibilities*. In 2010, after transferring to the DLA, Mr. Murphy and an interpreter participated in a video conference with a DLA representative who notified him that the DLA EEO office located in Columbus, Ohio, would provide EEO services to him. DSMF ¶¶ 17–18; PRDSMF ¶¶ 17–18. Taken together, these facts indicate that Mr. Murphy was familiar with the EEO process and was aware of the associated administrative procedures. Accordingly, the Court declines to extend the limitations period on the basis of 29 C.F.R. § 1614.105(a)(2).

### B.   Merits of Counts I (Disability Discrimination) and III (Age Discrimination)

The Rehabilitation Act prohibits the DLA from discriminating against its employees on the basis of disability. 29 U.S.C. § 794(a). Likewise, under the ADEA, the DLA must undertake all personnel actions "free from any discrimination based on age." 29 U.S.C. § 633a(a). The parties agree that the Court must test the validity of disability and age discrimination claims under the familiar burden-shifting

framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[77]  *See Rios-Jimenez v. Princip*, 520 F.3d 31, 40–41 (1st Cir. 2008) (applying the *McDonnell Douglas* test in the context of the Rehabilitation Act); *Bonefont-Igaravidez v. Int'l Shipping Corp.*, 659 F.3d 120, 123 (1st Cir. 2011) (applying *McDonnell Douglas* test in the context of the ADEA).

Under the *McDonnell Douglas* test, Mr. Murphy must first make out a prima facie case of discrimination.  To make out a prima face case of discrimination under the Rehabilitation Act, Mr. Murphy must prove by a preponderance of the evidence that: (1) "[he] was disabled within the meaning of the statute"; (2) "[he] was qualified to perform the essential functions of the job, either with or without a reasonable accommodation"; and (3) "the employer took adverse action against [him] because of the disability." *Rios-Jimenez*, 520 F.3d at 41 (citing *Bailey v. Georgia-Pac. Corp.*, 306 F.3d 1162, 1166 (1st Cir. 2002)).  The formulation for establishing a prima facie case under the ADEA is only slightly different.  The plaintiff must show that: (1) he was at least forty years old; (2) he applied and was qualified for the position; (3) the employer took an adverse employment action against him; and (4) the employer subsequently filled the position. *Cameron v. Idearc Media Corp.*, 685 F.3d 44, 48 (1st

---

[77]    There is some uncertainty in the First Circuit regarding the burden of proof applicable to a federal employee's ADEA claim.  *See Velazquestz-Ortiz v. Vilsack*, 657 F.3d 64, 74 (1st Cir. 2011) (discussing without deciding whether the First Circuit follows the D.C. Circuit's reading of the ADEA to require the more lax mixed motive framework for federal employees instead of the more demanding "but-for" test applied to private sector employees).  In an abundance of caution, the Court assumes the "less rigorous" mixed-motive standard applies.  *Id.*  Thus, Mr. Murphy must show that the adverse employment action he suffered "was caused at least in part by a forbidden type of bias." *Hillstrom v. Best Western TLC Hotel*, 354 F.3d 27, 31 (1st Cir. 2003).

Cir. 2012) (citing *Velez v. Thermo King de P.R., Inc.*, 585 F.3d 441, 447 n.2 (1st Cir. 2009)).

Once the plaintiff has made a prima facie case, the burden shifts to the DLA to proffer a legitimate, nondiscriminatory reason for the action. *See Rios-Jimenez*, 520 F.3d at 41 (disability discrimination); *Cameron*, 685 F.3d at 48 (age discrimination). Finally, if the DLA meets its burden, the burden shifts back to Mr. Murphy to establish that "the proffered reason is pretext intended to conceal discriminatory intent." *Rios-Jimenez*, 520 F.3d at 41 (disability discrimination); *see also Cameron*, 685 F.3d at 48 (age discrimination).

### 1.   Prima Facie Case

#### a.   Disability Discrimination

Mr. Murphy has not made out a prima facie case of disability discrimination. The parties agree that Mr. Murphy's deafness constitutes a disability within the meaning of the Rehabilitation Act. *Stip.* ¶ 3. Additionally, the record reflects that Mr. Murphy is qualified to perform the functions of a Supply Technician. *See* PSAMF ¶¶ 96–98; DRPSAMF ¶¶ 96–98. However, there is no evidence in the record that the DLA took adverse action against him "because of the disability." *Rios-Jimenez*, 520 F.3d at 41.

DLA Human Resources Specialist Lori Kendrick was the DLA contact for the General Supply Specialist positions at the GS-07 and GS-09 levels. DSMF ¶ 48; PRDSMF ¶ 48. In that capacity, she was responsible for reviewing the ranking list automatically generated by the USA Staffing system and determining which

applicants to mark for further review and interviews.  DSMF ¶ 49; PRDSMF ¶ 49.
In August 2013, when Ms. Kendrick reviewed the automated ranking lists for the GS-
07 and GS-09 positions and determined that Mr. Murphy's application did not
warrant further review, she was not aware of Mr. Murphy's disability.  DSMF ¶ 64;
PRDSMF ¶ 64.  In fact, his application indicated that he did not have a disability; in
response to a question that asked whether he was disabled, Mr. Murphy answered
"No."  DSMF ¶ 58–61; PRDSMF ¶ 58–61.  Because Ms. Kendrick was not aware of
Mr. Murphy's disability at the time she rejected his application, it is patent that the
DLA did not take adverse action against him "because of his disability."  Therefore,
the Court concludes that Mr. Murphy has not made out a prima facie case of disability
discrimination.

### b.      Age Discrimination

The Court also concludes that Mr. Murphy has failed to establish a prima facie
case of age discrimination.  The factual record demonstrates that Mr. Murphy is at
least forty years old, *Stip.* ¶ 1, that he applied and was qualified for the General
Supply Specialist positions, DSMF ¶ 41; PRDSMF ¶ 41; PSAMF ¶ 96–98; DRPSAMF
¶ 96–98, and that the individuals ultimately selected for the General Supply
Specialist positions were not disabled and were younger than Mr. Murphy.  DSMF
74; PRDSMF ¶ 74.  Ordinarily, this would "give[] rise to an inference that the
employer discriminated due to the plaintiff's advanced years."  *Acevedo-Parrilla v.*
*Novartis Ex-Lax, Inc.*, 696 F.3d 128, 138 (1st Cir. 2012) (quoting *Mesnick v. Gen. Elec.*
*Co.*, 950 F.2d 816, 823 (1st Cir. 1991)).

86

However, this inference cannot follow under the circumstances of this case. Ms. Kendrick was unaware of Mr. Murphy's age when she reviewed the applicant ranking list that the USA Staffing system automatically generated.  DSMF ¶ 64; PRDSMF ¶ 64; *see Harris v. Dow Chem. Co.*, 586 Fed. Appx. 843, 846 (3rd Cir. 2014) (holding that an inference of discriminatory action in the context of the *McDonnell Douglass* framework "may be raised only if the relevant decision-maker has knowledge of the plaintiff's status as a protected class member"); *Geraci v. Moody-Tottrup, Int'l, Inc*, 82 F.3d 578, 581 (3rd Cir. 1996) ("[I]t is counter-intuitive to infer that the employer discriminated on the basis of a condition of which it was wholly ignorant, and in this situation the bare *McDonnell Douglas* presumption no longer makes sense").  Because there is no evidence that Ms. Kendrick was at all aware of Mr. Murphy's age when she made the personnel decisions, the Court concludes that Mr. Murphy has failed to make out a prima facie case of age discrimination under the ADEA.

### 2.      Legitimate, Nondiscriminatory Reason

Assuming arguendo that Mr. Murphy established a prima facie case for disability and age discrimination, the burden shifts to the Secretary to offer a legitimate, nondiscriminatory reason for the action.  *See Rios-Jimenez*, 520 F.3d at 41 (disability discrimination); *Cameron*, 685 F.3d at 48 (age discrimination).  The Court readily concludes that the Secretary has met its burden.  First, the facts indicate that Ms. Kendrick did not designate Mr. Murphy's application for further review for the GS-07 position because the answers he submitted to the electronic USA

Staffing questionnaire automatically generated a score below that necessary to qualify for further review. DSMF ¶¶ 52–55; PRDSMF ¶¶ 52–55. Ms. Kendrick did not review the application materials of any candidate for the GS-07 level whose score fell below the cut-off. DSMF ¶ 54; PRDSMF ¶ 54. Likewise, Ms. Kendrick did not select Mr. Murphy's application for further review for the GS-09 position because his answers to the USA Staffing questionnaire automatically disqualified him from consideration; consequently, his name never appeared on the ranking list that Ms. Kendrick reviewed. DSMF ¶¶ 68–70; PRDSMF ¶¶ 68–70. Furthermore, as discussed above, Ms. Kendrick was not aware of his disability or age at the time she rejected Mr. Murphy's application to the General Supply Specialist positions. DSMF ¶ 64; PRDSMF ¶ 64.

Based on these facts, the Court finds that there was a legitimate, non-discriminatory reason for Ms. Kendrick's decision not to mark Mr. Murphy's application for further review. Specifically, Ms. Kendrick relied on the ranking lists that the USA Staffing system automatically generated from the applicants' completed questionnaires. The responses that Mr. Murphy submitted to USA Staffing did not qualify him for further review, and as such, Ms. Kendrick did not designate his application for additional processing.

### 3.      Pretext

Because the Secretary has offered a legitimate, non-discriminatory reason for the decision not to select Mr. Murphy's application for further review, the burden shifts back to Mr. Murphy to prove that "the proffered reason is pretext intended to

conceal discriminatory intent." *Rios-Jimenez*, 520 F.3d at 41.  Mr. Murphy presents no evidence that the final decision maker—Ms. Kendrick—had discriminatory intent. Instead, he urges this Court to apply the "cat's paw" theory, under which the Secretary can be liable for discrimination if the discriminatory animus of Mr. Murphy's supervisors tainted Ms. Kendrick's decision.  *See Harlow v. Potter*, 353 F. Supp. 2d 109, 115 (D. Me. 2005).  To invoke the cat's paw analysis, Mr. Murphy must establish two conditions: (1) that his supervisors exhibited discriminatory animus and (2) that Ms. Kendrick acted as the conduit of the supervisors' prejudice.  *See id.* (citing *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 227 (5th Cir. 2000)); *see also Cariglia v. Hertz Equipment Rental Corp.*, 363 F.3d 77 (1st Cir. 2004).  That is, an employer may be held liable if the final decision maker merely acted as a rubber stamp, or "the cat's paw," of others who were acting from discriminatory motives and who possessed leverage, or exerted influence over the "titular decisionmaker."  *Id.* at 117 (citing *Russel*, 235 F.3d at 227).

Mr. Murphy argues that his supervisors and disability program representatives repeatedly failed to respond to his requests for help and training on the USA Staffing website.  *Pl.'s Opp'n* at 20.  He asserts that "[b]ecause Mr. Murphy was not provided accommodations, much less even assistance, in his attempts to apply for promotions, his job application was inaccurate."  *Id.* at 20–21.  In other words, Mr. Murphy contends that his supervisors exhibited discriminatory animus by failing to help Mr. Murphy with the USA Staffing website, and therefore Ms.

Kendrick acted as a conduit of the supervisors' prejudice when she rejected his inaccurate application.

The Court concludes that the "cat's paw" analysis is inapplicable in the present case because Mr. Murphy's supervisor's involvement in Ms. Kendrick's decision was too attenuated. The cases that apply the "cat's paw" analysis—including all of the cases that Mr. Murphy cites—involve biased individuals who engaged in conduct that directly manipulated the information that an impartial final decision maker relied upon to come to a decision. *See Staub v. Procter Hosp.*, 562 U.S. 411, 421 (noting that "any case of cat's paw liability" requires reliance on "facts provided by the biased supervisor"). Thus, in *Cariglia*, the First Circuit applied the "cat's paw" analysis where an employee argued that a supervisor, who harbored discriminatory age-based animus against him, withheld exculpatory evidence from decision makers and thereby the supervisor's "animus impermissibly tainted the decisionmaking process." 363 F.3d at 83.

Consistent with *Carigllia*, in *Harlow*, this Court applied the "cat's paw" analysis where an allegedly discriminatory supervisor who suspected an employee of falsifying time reports submitted a biased report to the acting plant manager, who in turn forwarded the information to a labor specialist. 353 F. Supp. 2d. at 112. The labor specialist relied on the biased information provided directly by the employee's supervisor and recommended dismissing the employee. *Id.* at 112.

Similarly, in *Cote v. T-Mobile USA, Inc.*, 168 F. Supp. 3d 313 (D. Me. 2016), this Court applied the "cat's paw" analysis where an allegedly discriminatory

90

supervisor provided misleading information directly to an unbiased decision maker who in turn fired the employee.  *Id.* at 336–37.

In these cases, the supervisor whom the employee accused of discriminatory animus directly provided misleading information to or withheld exculpatory information from the unbiased decision maker.  This direct involvement in the decision making process raises the possibility that the supervisors' discrimination tainted the supposedly unbiased decision.  Yet here, there is no evidence that Mr. Murphy's supervisors communicated with Ms. Kendrick whatsoever.  Nor is there any indication that any of Mr. Murphy's supervisors meddled with the information that Ms. Kendrick used to arrive at her decision not to designate Mr. Murphy's application for further review.  As such, Ms. Kendrick did not act as anyone's "cat's paw"; rather, she relied solely on the information that Mr. Murphy himself submitted on the USA Staffing questionnaire.

The Court is sympathetic to Mr. Murphy's assertion that he never received accommodation or training on how to navigate the USA Staffing website, and the Court appreciates that it could be very difficult to navigate the online system with minimal English skills.  Yet these concerns are applicable to Mr. Murphy's claim that the Secretary failed to provide reasonable accommodations.  Notably, the Secretary has not moved for summary judgment on this count, and thus Mr. Murphy will be able to press his argument that the DLA's failure to accommodate him on the USA Jobs website led to his failure to receive a promotion.

In sum, because Ms. Kendrick was not aware of Mr. Murphy's age or disability at the time she made the decision not to select Mr. Murphy's application for further review, and because Mr. Murphy's supervisors were not directly responsible for providing Ms. Kendrick with misleading information relating to Mr. Murphy's application, the Court concludes that the Secretary is entitled to summary judgment on Counts I and III of Mr. Murphy's complaint.

## VI.    CONCLUSION

The Court GRANTS the Defendant's Motion for Partial Summary Judgment (ECF No. 61) (*Redacted Documents*, Attach. 3, *Def.'s Mot. for Partial Summ. J.* (ECF No. 102)).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 27th day of March, 2017